136 So.2d 656 (1962)
Anselmo L. ALLIEGRO, Jr., a Minor, by and through His Legal Guardian and Father, Anselmo Alliegro and All Other Persons Similarly Situated, Joined, et al., Appellants,
v.
PAN AMERICAN BANK OF MIAMI, a Florida Banking Corporation, Sottile, Inc., a Florida Corporation, James Sottile, Sr., and James Sottile, Jr., Appellees.
No. 60-720.
District Court of Appeal of Florida. Third District.
January 15, 1962.
Rehearing Denied February 7, 1962.
*657 Sibley, Grusmark, Giblin, King & Levenson, Miami Beach, and Robert Paul, Miami, for appellants.
Ward & Ward and William B. Roman, Miami, for appellees.
Before PEARSON, TILLMAN, C.J., and CARROLL and HENDRY, JJ.
HENDRY, Judge.
This is an appeal from a decree dismissing appellants' complaint for an accounting, injunction and other equitable relief. The decree was entered by the circuit court of Dade County in favor of appellees pursuant to their petition for a rehearing.
The suit was instituted in the circuit court by Anselmo L. Alliegro, Jr., a minor, by and through his legal guardian and father, Anselmo Alliegro. Later, the other plaintiffs were allowed to intervene as parties plaintiff. The plaintiffs sued, as minority stockholders of the Pan American Bank of Miami, for and in behalf of the bank, which was a nominal defendant. The other defendants are Sottile, Inc., James Sottile, Sr., and James Sottile, Jr. Sottile, Inc., hereinafter referred to as Parent, owned 80% of the capital stock of the Pan American Bank, hereinafter referred to as Bank. James Sottile, Jr., hereinafter referred to as Sottile, owned 5.85% of the capital stock of the Bank, and was its president. James Sottile, Sr., was chairman of the board of directors of the bank.
The complaint sets forth three separate grounds for relief, together with a prayer for attorneys' fees and such other relief as the court may deem equitable and just. The initial ground is concerned with the filing of consolidated federal income tax returns for the years 1955, 1956, 1957 and 1958 by the Parent and its subsidiaries, one of which was the Bank. The complaint states that the Parent, through its ownership and domination of the Bank used the federal tax procedure to wrongfully extract more that $1,400,000 from the Bank. It is alleged that the scheme was used during the years in question when the Parent had sustained large losses and the Bank had shown substantial earnings. By means of the consolidated tax procedure, the earnings of the Bank, during each of those years were offset against the losses of the Parent with the result that the Bank incurred no federal tax. At the end of each year, the Bank transferred to the Parent the tax savings (the amount the Bank would have paid to the government if it had filed a separate federal income tax return and not a consolidated return with the Parent). It is by reason of the foregoing procedure, that the appellants assert that the Parent is indebted to the Bank in the approximate amount of $1,400,000  this being the amount that the Parent (majority stockholder) had unlawfully received as a preferential dividend.
*658 The second ground for recovery is based on an agreement of guaranty allegedly executed by the Parent by which the said corporation did guarantee certain worthless or doubtful loans of the Bank. Despite the fact that many of the said loans have been written off as worthless by the Bank, the Parent has failed to make good on its alleged agreement of guaranty and refuses to acknowledge any such obligation.
The third ground upon which the prayer for relief is predicated is the alleged tortious conduct of the appellee, Sottile. It is alleged that he knowingly caused the Bank to become a part of a usurious scheme which culminated in litigation in which this court in Coral Gables First National Bank v. Constructors of Florida, Inc., Fla.App. 1960, 119 So.2d 741, affirmed a decree of the lower court subjecting the Bank to a penalty and loss of $438,584.56.
In the case now before us, the lower court entered its initial final decree on July 27, 1960 and found that:
(1) The Parent was indebted to the Bank because it had no right to the tax savings in the principal sum of $962,971.81 resulting to the bank by reason of the consolidated returns since such was accomplished by a mere resolution of the board of directors and without ratification of the minority stockholders of the Bank;
(2) The Parent was indebted to the Bank in the principal sum of $236,129.60 because of the Parent's breach of the written agreement to "remove from the Bank's portfolio" $2,000,000 of certain "doubtful" loans which were referred to in a bank examiner's report, unless such loans were collected or no longer considered as "doubtful" by the Federal Reserve Bank of Atlanta; and
(3) The Bank has a valid claim against Sottile by reason of his tortious conduct when he was president of the Bank, which caused the Bank to become liable for $438,584.56 because of its participation in a usurious transaction which was the subject of the aforesaid litigation.
The court also retained jurisdiction for the purpose of ascertaining and determining the amount of attorneys' fees, if any, appellants' attorneys should be awarded for their services.
The sum effect of the initial decree was the awarding of a judgment against the Parent in the sum of $1,119,101.41 together with accrued interest; in addition, the court retained jurisdiction for the purpose of enforcing and effectuating the written agreement relative to the $2,000,000 of doubtful loans in the loan portfolio and for the purpose of setting the attorneys' fees, if any, as well as for effectuating all provisions of the decree.
A petition for rehearing was granted and the decree previously entered was set aside and the cause was dismissed with costs to the appellants. It is from this decree that this appeal is prosecuted.
Let us now consider the first main point of contention, to-wit:
Did the monies which the Bank transferred to the Parent as "tax savings" constitute an illegal preferential dividend to a majority stockholder?
Appellants assert that there is no authorization for such a procedure under the applicable provisions of the Internal Revenue Code; that availability of the consolidated tax procedure for affiliated corporations does not encompass any shifting of cash from the "gain" corporation to the "loss" corporation; and that any such attempt is a mere subterfuge for paying dividends without the inclusion of the minority stockholders.
Appellees contend that there was a valid contract between the Bank and the Parent to the effect that the group member, incurring the loss and thereby effecting the "tax savings" to the member having the earnings, shall be repaid in the amount of the tax savings by such member having the gain; that the evidence shows that there were years in which the Bank, having sustained a loss, was the recipient of monies paid to it by the *659 Parent which had incurred the gain; that the Internal Revenue Code provides for such a procedure as an integral part of the consolidated tax procedure; and that as a result of the above, a valid contract existed which is in nowise contrary to any law but in fact, is supported by federal law.
We find after a careful review of the evidence presented and the authorities cited and found that we must reject the appellees' position and hold that the chancellor erred in reversing and vacating the initial decree on rehearing with respect to the instant question.
The "contract" which appellees allege was entered into by the Parent and all of its affiliates, was based on similar resolutions which were allegedly adopted by all of the boards of directors of the affiliated corporations. The board of directors of the Bank on May 10, 1956 adopted the following resolution:
"Resolved, that in compliance with the Federal regulations governing consolidated tax returns, that the Pan American Bank of Miami shall file a consolidated income tax return with South Dade Farms, Inc.,[1] whose fiscal year ends June 30, and the Chairman, President, or Executive Vice-President, individually, or any Vice-President, together with any other officer are empowered to execute the consent to the filing of said consolidated return and as its share of the consolidated income tax, the Pan American Bank of Miami shall pay to South Dade Farms, Inc., the amount of tax which it would have paid had a separate return been filed."
Assuming, solely for the sake of argument, that the similar resolutions alleged to have been passed by the boards of directors of the affiliates, contained all the necessary requisites for a contract among the various members of the group, i.e. offer, acceptance, consideration, etc., we hold that such a contract would constitute an illegal contract since it was never ratified by all of the stockholders of the Bank. This is so, because the contract, in effect, provides for the payment of dividends from a corporation (Bank) to its majority stockholder (Parent) alone. To effect such an unusual transaction, the law requires the unanimous consent of the stockholders. Penfield v. Davis, N.D. Ala. 1952, 105 F. Supp. 292; Fletcher, Private Corporations, § 5352 (perm.ed.rev.vol. 1958).
While we are not unmindful of appellees' argument that the monies to be transferred were not dividends but rather the proportionate share of the Bank's federal taxes, it is our opinion that such payment is neither authorized nor condoned by any federal statutory law, rule, regulation or case law.[2] Moreover, the authorities which have been found lead to the inescapable conclusion that such a procedure, as here involved, is violative of the rights of the minority stockholders. Such conclusion holds true despite the rule that dividends are not normally recoverable from stockholders once they are paid to them. The rule does not hold where a majority stockholder receives dividends which he knows are not paid pro rata to all stockholders. Under such circumstances aggrieved stockholders may bring a derivative action to have the dividends wrongfully paid restored to the corporation.[3]
Appellees cite §§ 1502 and 1552 Int.Rev. Code of 1954,[4] 26 U.S.C.A. §§ 1502, 1522 *660 and regulations thereunder as support for their position.
They contend that the payments here involved are not dividends but authorized reimbursements among affiliated corporations filing under these code provisions. Yet a reading of these provisions and the regulations promulgated thereunder, leads to the irrefragable conclusion that they are inapplicable to the present situation. All such authorities deal with the alternatives that are available to taxpayers filing federal consolidated tax returns for the payment of the tax liability owed by the group. In the case at bar, it is admitted that there was no income tax liability incurred by the group for the years involved.
Even without any support from federal law or otherwise, it is appellees' position that the monies transferred from the Bank did not constitute a dividend but rather, were transferred pursuant to an agreement. Assuming, once again, for the sake of argument, there was an agreement relative to the transfer of these monies to the Parent it would be an illegal one without unanimity of stockholders consent if the procedure involved was a guise for the payment of dividends.
A "dividend" has been defined as a payment to the stockholders as a return upon their investment.[5] It should be noted that a distribution may be treated as a dividend although the corporation has taken no formal action to designate it as such. The devices available to disguise dividends are as numerous as the ways in which a corporation can disburse its funds. It has been universally recognized that the mere fact that the distributions are not called "dividends" by the board of directors of the corporation does not detract from such distributions being dividends within the meaning of the law. This is so regardless *661 of the fact that the distributions are made in proportions other than the stockholders' respective holdings. Lincoln Nat. Bank v. Burnet, 1933, 61 App.D.C. 354, 63 F.2d 131.
The closest case to the present one with respect to similarity of facts is Beneficial Corp. v. Commissioner, 18 T.C. 396. That case concerned the propriety of the demand of the Commissioner that amounts paid to a parent corporation by its subsidiary corporation with which it filed consolidated returns constituted taxable dividends to the extent that they exceeded the tax liabilities properly allocable to the subsidiaries in the consolidated return. Unlike our situation, there was a tax liability after the consolidated return was filed. However, the monies paid to the Parent were in excess of the proportionate tax liability incurred. The court found that such excess payments were dividends within the meaning of the code and held for the Commissioner.[6]
It is especially important to recognize the striking similarity between the tax resolutions[7] passed by the subsidiaries in the Beneficial case and the Bank's resolution as interpreted by the appellees herein. For all practical purposes, they are the same. Nevertheless the tax court found that the payments to the parent corporation by the subsidiaries which were in excess of any allocable tax liability constituted dividends to the extent of the available earnings and profits. The case at hand is in one respect even weaker than the Beneficial case with regard to the position the appellees take. In Beneficial there was an attempt to have these periodic payments go to a future reserve for the purpose of paying the tax liability of the group which in fact had been occurring. Unlike that situation, here there was neither a tax liability nor was there a reserve account set up by the Parent from which the Bank could draw for future tax liability. Such funds as were paid under this procedure were paid voluntarily and not pursuant to any enforceable agreement. The conclusion is thus inescapable that the payments from the Bank to the Parent were dividends.
Since these dividends were paid to a majority stockholder to the exclusion of the remaining stockholders, they were improper without the ratification of all of the stockholders. Penfield v. Davis, supra. There can be no doubt that the Parent was aware of the fact that these payments were being distributed to it alone without any regard for the obvious rights of the minority stockholders. Accordingly, equity requires that improperly paid dividends be restored to the paying corporation when a derivative suit is brought by aggrieved *662 stockholders as in the present case. Chicago Ry. Equipment Co. v. National Hollow Brake Beam Co., 1912, 173 Ill. App. 573.
The second major ground for relief is based on an alleged guaranty by the Parent of $2,000,000 worth of loans in the Bank's loan portfolio. It is essential in determining whether an agreement of guaranty exists to have clearly in mind the events leading up to the alleged guaranty.
On July 10, 1958, Sterling A. Wood, Chief Inspector of the Sottile Banking Group, wrote a letter[8] to Sottile advising him of the precarious position of the Bank with respect to the Bank's standing with the Federal Reserve System. The fact that Mr. Wood was employed by the Parent clearly demonstrates that the Parent was well advised of the action that it would have to take if the Bank were to continue to operate in the Federal Reserve System. This is so because the record reveals that the conference as described in the aforesaid letter was arranged by the Parent to determine what must be done to prevent the threatened action of the Federal Reserve Board.
*663 Fourteen days after Mr. Wood's report was made, the Parent sent a pledge signed by the President and chairman of the board to the Bank which pledge appellants contend constitutes an agreement of guaranty. The pledge reads as follows:
 "July 24, 1958
"Board of Directors,
"Pan American Bank of Miami,
"Miami, Florida.
"Gentlemen:
"As the owners of 80% of the Capital Stock of Pan American Bank of Miami, and in consideration of the signing and delivery by you this date, of a letter addressed to the Federal Reserve Bank of Atlanta, we hereby assure you that we are familiar with the provisions of the statement made by you under `Action A' in the said letter, and pledge that we will carry out the commitment set forth therein to remove from the bank's loan portfolio, under the conditions mentioned in sub-paragraphs 1, 2, and 3, of said `Action A', by March 31, 1959, $1,000,000.00 of said loans; by March 31, 1960, an additional $500,000.00; and by March 31, 1961, the remaining $500,000.00."[9]
*664 The clear language of the pledge reveals that the Parent, as an 80% stockholder, was attempting to protect its substantial investment in the Bank. This was to be done by guaranteeing that approximately $2,000,000 of loans of the Bank which the Federal Reserve examiner classified as "doubtful", would be collected or corrected and removed from the bank portfolio by March 31, 1961. Any amounts not so collected or corrected would be made good by the Parent. To hold otherwise would be to look beyond the clear meaning of the pledge.
Appellees contend that there was no valid agreement based upon any consideration as between the Bank and its majority stockholder. We must reject this contention as unsound. When the Parent unequivocally guarantees the value of certain assets of its subsidiary to protect its interest in such subsidiary, there is present both the necessary corporate power and sufficient consideration to enforce such a guaranty. In the case of In re Duncan & Goodell Co., D.D.Mass. 1936, 15 F. Supp. 550, 551, the court said:
"In Massachusetts, as elsewhere, however, a business corporation has power to guarantee the obligations of a subsidiary, because such a guarantee may be necessary in order to protect the interest of the corporation in the subsidiary.
"In American Surety Company of New York v. 14 Canal Street, Inc., 276 Mass. 119, 176 N.E. 785, 788, a whollyowned subsidiary of the defendant has been sued and its property attached. The plaintiff was surety on a bond given to release this property from the attachment. The plaintiff became surety upon this bond in reliance upon an agreement of the defendant to indemnify it in case of loss. The plaintiff was forced to pay a judgment. The court held that it was entitled to recover the amount so paid from the defendant."
It is especially significant to note that in the above mentioned American Surety Company case, the guarantor's fear of the attachment on the property of its subsidiary is closely analogous to the Parent's fear of the action to be taken by the Federal Reserve Board herein. In both cases, action is about to be taken which the parent corporation believes will be harmful to its interest in the subsidiary corporation.
We hold that the pledge of the Parent in the instant case is supported by sufficient consideration and constitutes an enforceable agreement by which the Parent bound itself to remove from the Bank's loan portfolio prior to March 31, 1961, a total of $2,000,000 of doubtful loan classifications contained in the March 31, 1958 examination, unless collected or corrected in such a manner that would remove the loans from the doubtful classification.
It is appellees' contention that all such loans charged off as losses on income *665 tax returns would be a compliance with the requirement that they be corrected or removed from the "doubtful" loan category. We can not accept appellees' interpretation of the agreement. If this were the interpretation of the pledge, it would not have altered the weak capital structure of the Bank and accordingly, the Federal Reserve Board would not likely have changed its attitude toward the Bank. The clear meaning of the language of the pledge in view of the events leading up to its creation leads to the conclusion that the Parent, by the pledge, guaranteed either the collection or correction of the "doubtful" loans so that they could be turned into certain and definite assets and thereby strengthen the capital structure of the Bank. Hence, the lower courts decree on rehearing with respect to the agreement of guaranty must be reversed.
The third major prayer for relief is based on the alleged tortious acts of the Bank's president, James Sottile, Jr., which caused the Bank to become liable to others by reason of its participation in a usurious loan transaction.[10] Appellants alleged that Sottile, through his domination and control of the Bank, wilfully and wrongfully involved the Bank in the said transaction with the Coral Gables First National Bank because of his ownership and interest in that Bank; that such action is a breach of the fiduciary duty owed by Sottile to the Bank; and that by reason of such breach, Sottile is liable to the Bank for the loss it sustained in participating in the usurious transaction.
We have examined the evidence in the record with care and it is our determination that there was no competent substantial evidence to show that Sottile was connected in such a way with the making of the usurious loan here involved, as to make him personally liable to the Bank for its loss. The mere fact that a corporation, through its board of directors, approves a transaction which it should have reason to believe is illegal, does not of itself bring personal liability on the president of the corporation.
Since no individual liability has been shown to exist with respect to James Sottile, Jr., we hold that the complaint should have been and it hereby is dismissed with prejudice as to that defendant.
Both sides have raised other points and they have been duly considered, but found to be without merit.
In accordance with the views expressed in this opinion, it is our conclusion that the chancellor committed error in dismissing the cause on rehearing with respect to the monies transferred to the Parent under the consolidated tax procedure and with respect to the claim that the Parent had executed an agreement of guaranty and accordingly those portions of the decree are reversed.
We are remanding the cause with directions to the trial court as follows:
1. To ascertain the amount of monies transferred to the Parent by the Bank under the consolidated tax procedure, giving the Parent credit for any payments to the Bank which were made in furtherance of said procedure, and enter judgment for that amount in favor of the Bank against the Parent, the said Sottile, Inc., together with accrued interest at six per cent per annum from the dates so transferred.
2. To ascertain the sum of the "doubtful" loans which have been collected or corrected and removed from the "doubtful" category and enter judgment in favor of the Bank against Sottile, Inc. for the amount by which two million dollars ($2,000,000) exceeds such sum, with interest thereon at six per cent per annum from payment dates as fixed by the guaranty agreement.
3. To determine whether attorneys for the original plaintiff and for the intervening *666 plaintiffs are entitled to be awarded attorney fees, and to what extent and for what services or part of the cause, and if found allowable, to determine the amount and order payment thereof by the obligated party or parties based on proofs on hearing after due notice to parties affected.
Reversed and remanded with directions.
NOTES
[1] South Dade Farms, Inc., was the predecessor to the Parent, Sottile, Inc.
[2] See Western Pac. R.R. Corp. v. Western Pac. R. Co., 9 Cir.1952, 197 F.2d 994, where the court found that the "loss" corporation was not entitled to the "tax savings" since such a procedure was not a part of the federal consolidated tax return procedure.
[3] See 13 Am.Jur., Corporations, § 718 p. 741; Anno: 55 A.L.R. 68, s. 76 A.L.R. 885, and 109 A.L.R. 1381.
[4] Those sections read as follows:

"§ 1502. Regulations.
The Secretary or his delegate shall prescribe such regulations as he may deem necessary in order that the tax liability of any affiliated group of corporations making a consolidated return and of each corporation in the group, both during and after the period of affiliation, may be returned, determined, computed, assessed, collected, and adjusted, in such manner as clearly to reflect the income-tax liability and the various factors necessary for the determination of such liability, and in order to prevent avoidance of such tax liability."
"§ 1552. Earnings and profits.
"(a) General Rule.  Pursuant to regulations prescribed by the Secretary or his delegate the earnings and profits of each member of an affiliated group required to be included in a consolidated return for such group filed for a taxable year beginning after December 31, 1953, and ending after the date of enactment of this title, shall be determined by allocating the tax liability of the group for such year among the members of the group in accord with whichever of the following methods the group shall elect in its first consolidated return filed for such a taxable year;
"(1) The tax liability shall be apportioned among the members of the group in accordance with the ratio which that portion of the consolidated taxable income attributable to each member of the group having taxable income bears to the consolidated taxable income.
"(2) The tax liability of the group shall be allocated to the several members of the group on the basis of the percentage of the total tax which the tax of such member if computed on a separate return would bear to the total amount of the taxes for all members of the group so computed.
"(3) The tax liability of the group (excluding the tax increases arising from the consolidation) shall be allocated on the basis of the contribution of each member of the group to the consolidated taxable income of the group. Any tax increases arising from the consolidation shall be distributed to the several members in direct proportion to the reduction in tax liability resulting to such members from the filing of the consolidated return as measured by the difference between their tax liabilities determined on a separate return basis and their tax liabilities (determined without regard to the 2 percent increase provided by section 1503(a)) based on their contributions to the consolidated taxable income.
"(4) The tax liability of the group shall be allocated in accord with any other method selected by the group with the approval of the Secretary or his delegate."
[5] 13 Am.Jur., Corporations, § 645, p. 637. See Hellmich v. Hellman, 276 U.S. 233, 48 S.Ct. 244, 72 L.Ed. 544.
[6] The court in Beneficial employed the definition of dividends as set out in the Internal Revenue Code. The applicable provision of § 316, Int.Rev.Code of 1954, 26 U.S.C.A. § 316 (successor to § 115 as quoted in Beneficial), reads in part as follows:

"* * * the term `dividend' means any distribution of property made by a corporation to its shareholders 
"(1) out of its earnings and profits accumulated after February 28, 1913, or
"(2) out of its earnings and profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made."
[7] "RESOLVED: That (1) the proper officers of this Corporation, from time to time, hereby are authorized to execute and deliver Consents and to take such other action as may be required for the filing of this Corporation's Federal tax returns in consolidation with its parent company and other affiliates, and (2) the Treasurer of this Corporation is hereby authorized to provide reserves for Federal taxes on the books of this Corporation, out of earnings, in the amount calculated to be payable by this Corporation on a separate return basis and to remit funds to the parent company in discharge of this Corporation's Federal taxes, provided, however, that in no event shall the amount of funds remitted exceed the amount of Federal tax reserves provided on the books of the Corporation as herein authorized."
[8] Mr. Wood's letter reads in part as follows:

"July 10, 1958
"Subject: Conference with Honorable James Louis Robertson, Member.
"Board of Governors, Federal Reserve System, Washington, D.C.
"From: Sterling A. Wood, Chief Inspector
"To: James Sottile, Jr.
"At 2:30 P.M. on Wednesday, July 9, Mr. Louis H. Sedlacek and the undersigned had a conference with Governor Robertson. The conference lasted until approximately 5:00 P.M.
"The conference was highly unsuccessful from their point of view, but it did give us an opportunity to discuss, in a friendly fashion, many of the problems concerning the Pan American Bank. Even though the net results were quite unsatisfactory, I believe that the discussion did shown (sic) that management of the bank has increased its efforts to eliminate the many criticisms that have been recurring in the past Federal Reserve Reports of Examination.
"We were informed that the Federal Reserve Board, based on the last examination and its relation to preceeding (sic) ones, had shown so little improvement that the Board had already decided to cite the bank under both Paragraphs 9 and 10.
"The combined effect of these two sections would be:
"a) To eliminate the bank from being a member of the Federal Reserve System.
"b) The foregoing would automatically remove the bank from its insured status by the F.D.I.C.
"c) It would force the elimination of whatever officers it held responsible for permitting the present condition in the bank.
The Federal Reserve Board realize that this is very drastic action and they are hoping it will not be necessary to carry through with such action, because it could not help but have a serious adverse effect on the standing of the bank in the community.
* * * * *
"While we explored every possible angle to soften their attitude, there was no weakening in their position. A short recess was then held and afterwards, Mr. Sedlacek and myself returned, and Mr. Robertson laid down the following conditions:
"1) That he would recommend to the Board of Governors of the Federal Reserve System on Thursday, July 10, that a 90 day period of grace be permitted the Pan American Bank to see if they could improve their capitalization and loan position.
"2) That he could not guarantee approval by the Board of his recommendation, but that if it was not approved, the bank would be notified on July 10.
"3) He desired that a letter be prepared by me on October 1, 1958, requesting that a date be set whereby representatives of the Sottile Banking Group, as well as the Pan American Bank, could meet, and wherein the bank would be permitted to show what definite progress had been made relative to the present condition. This conference to be held approximately October 15, 1958.
"4) If the progress was not considered satisfactory by the Board immediate steps would be taken to cite the bank under both Sections 9 and 30.
"5) Mr. Robertson was coldly firm in his final statement that the bank must realize that they considered it to be in a highly unsatisfactory condition, and that definite and positive steps must be taken to prevent the bank being cited under the two paragraphs noted above."
[9] The letter referred to in the pledge as the consideration for the pledge was sent by the Bank to the Federal Reserve Bank of Atlanta. The applicable portions of the letter are as follows:
 "July 24, 1958
"Mr. J.E. Denmark, Vice President
"Federal Reserve Bank of Atlanta
"Atlanta, Georgia

"Dear Mr. Denmark:
"Receipt is acknowledged of your report of examination made as of March 31, 1958, transmitted with your letter dated June 20, 1958. At the regular meeting, held on July 10, 1958, an announcement was made to the Board of the receipt of the recent examination report, and because of its voluminousness, each director was requested to come into the bank and read it in detail. A copy of your letter, as well as the one received from the Board of Governors, dated July 11, 1958, was enclosed with the notice of a special meeting called for July 24, so that all the directors would be prepared for further discussion and could take part in the preparation of this reply under their individual signatures. Each director has individually studied the report of examination.
"You may be assured that we are now fully aware of the unsatisfactory problems confronting the bank, and steps have already been initiated towards their elimination. Your letter specifically sets forth four separate actions to be taken by the Board in its efforts to strengthen the bank. Comments on these required actions are written out in this letter.
"ACTION A: As you know, the Board of Directors does not have legal authority to change the capital structure of the bank. This action can only be effected by the stockholders. The Board agrees that additional capitalization would be of material benefit to the Pan American Bank, and in consideration thereof has adopted a resolution, copy of which is enclosed herewith.
"Your request for at least $3,000,000.00 of additional capital funds is believed to be much too high, and it cannot be met at this time. Loss of deposits as a result of reducing the interest rate on savings, and the forced liquidation of approximately $6,000,000.00 of loans within the recent past, with the attending loss of related business, has increased the percentage of book capital to deposits to 7.4, and total resources to 6.6. The State average of capital to resources is 6.1, and your average is 6.4 respectively. This computation does not include the loan valuation reserve of $409,110.33. At the time of acquisition of control, the ratio was 4.2. Thus there has been an increase of 76%.
"It is believed that a much more realistic approach to actual needs is sound rather than book capital structure in relation to deposits. In this connection, the large amount of doubtful classifications are not concurred in for the reason that no allowance was made for even the junk or under the hammer values of the vast amount of collateral pledged. It is conceded that the loans classified as doubtful are bad situations, but they are not as bad as portrayed. In your formula of determining the sound capital structure, you consider 50% of the doubtful classification as loss, which automatically reduces it by $1,000,000.00, which we believe to be entirely too severe.
"Because of the variance of opinions as to the actual amount of loss that may emanate from the loans classified as doubtful, it is proposed to place them under the acid test of liquidation. To assure you that this will be carried out, we wish to submit the following program for your consideration:
"1) That the Sottile interests have pledged themselves to remove at least $1,000,000.00 of the present doubtful loan classifications contained in the March 31, 1958 examination prior to March 31, 1959, unless collected or corrected in such a manner that you will remove the loans from the doubtful classification.
"2) Prior to March 31, 1960, an additional amount of $500,000.00 will be eliminated under the same conditions.
"3) Prior to March 31, 1961, the remaining $500,000.00 will be removed under the same conditions.
(Copy of this pledge is attached)
* * * * *
"In conclusion, we wish to reiterate that we are now fully aware of the unsatisfactory conditions set forth in the report and your letter, and assure you that concentrated efforts will be made toward their early correction. We feel certain that the next report of examination will show notable improvement.
 "Very truly yours,
 "____________________"

[10] See Coral Gables First National Bank v. Constructors of Florida, Inc., supra.