**GETTY OIL COMPANY, Plaintiff,**

v.

**SKELLY OIL COMPANY, Defendant.**

Court of Chancery of Delaware.

New Castle.

June 12, 1969.

---

5. At a convenient time counsel may submit a more definitive order.

Henry M. Canby, of Richards, Layton & Finger, William S. Potter and Charles S. Crompton, Jr., of Potter, Anderson & Corroon, Wilmington, and Hecht, Hadfield, Hays, Landsman & Head, New York City, for plaintiff.

James M. Tunnell, Jr., and Walter K. Stapleton, of Morris, Nichols, Arsht & Tunnell, Wilmington, and Covington & Burling, Washington, D. C., for defendant.

DUFFY, Chancellor:

This is a declaratory judgment action by a corporate parent for the purpose of determining its duty, if any, to share quotas for the importation of crude oil into the United States with a subsidiary.

I

Getty Oil Company, a Delaware corporation, (Getty) owns (through Mission Corporation, a publicly owned holding company) 71% of the stock of Skelly Oil Company (Skelly). Skelly is also a Delaware corporation and the balance of its stock is publicly held. Both Getty and Skelly are in the business of refining and marketing crude oil and crude oil products. Since Getty's acquisition of its interest in Skelly, the latter has continued operations independent of Getty. Buying, refining and marketing are conducted as a Skelly enterprise and its dealings with Getty are both infrequent and limited.

Getty filed this action for a declaratory judgment; Skelly answered and counterclaimed, asking for a declaration of Getty's obligations with respect to oil import

allocations and for an accounting of the damages sustained by Skelly as the result of Getty's appropriation of all oil allocation for its own use and benefit. Both parties moved for summary judgment, and this is the decision thereon.

## II

For several years prior to 1959, oil imports into the United States were restricted under a voluntary program in which most if not all of the major oil companies participated. By Presidential Proclamation a Mandatory Oil Import Program was inaugurated in March 1959. This provides for quotas on the importation of foreign oil, including crudes, and is administered by the Secretary of the Interior. As a result of the Proclamation, importation of crude oil is prohibited (with exceptions not here pertinent) except under a license issued pursuant to an allocation made under the Secretary's Regulations.

Skelly is a "person" and has "refining capacity" and "refinery inputs" within the meaning of the Proclamation and the Regulations. These are the ordinary tests for a quota allocation. But the Regulations also provide that where an otherwise eligible person is owned or controlled by another legal entity the two will be "regarded as one" and an allocation will be made to the controlling person "on behalf of itself and its subsidiary." Specifically, Regulation 4(g) states:

"A person is not eligible individually for an allocation of imports of crude oil and unfinished oils or finished products if the person is a subsidiary or affiliate owned or controlled by reason of stock ownership or otherwise, by any other individual, corporation, firm, or other business organization or legal entity. The controlling person and the subsidiary or affiliate owned or controlled will be regarded as one. Allocations will be made to the controlling person on behalf of itself and its subsidiary or affiliate but,

upon request, licenses will be issued to the subsidiary or affiliate."

And as a transition from voluntary (and unsuccessful) to mandatory controls, the Proclamation permits allocations to be based on the greater of either a declining percentage of an importer's last quota under the voluntary system (the "historical basis") or on the size of current refining operations (the "input basis").

Prior to June 1967, Skelly had a separate allocation, but that was determined to be improper under the Regulations. Skelly Oil Company v. Udall, D.C., 288 F.Supp. 109 (1968). So any allocation which Skelly is to receive must, under the program as it is now administered, come through Getty which refuses to share its allocation.

Getty has an historical position, Skelly has none. The quota allocated to Getty is based on the historical formulation and this simple fact is the corner stone if its argument here. It says that it has no duty to share with Skelly an allocation which was awarded by virtue of its position (through Tidewater Oil Company which was merged into it on September 30, 1967) as an "historic" importer of foreign oils. It argues that the Regulations provide independent methods of determining allocations and that any forced sharing would require it to make a gift to Skelly. Getty recognizes that if at some future time Skelly's refinery input contributes in some way to the basis of the allocation, Getty will then have some obligation to share it with Skelly. But until then, it argues, no duty exists.

## III

I first consider the standard to be applied in determining the duty of parent to subsidiary. What duty, if any, does the parent have to its subsidiary, under the special facts of this case? The answer to that question was stated recently by this Court in Meyerson v. El Paso Natural Gas

Co., Del.Ch., 246 A.2d 789 (1967) when Vice Chancellor Short wrote:[1]

" * * * But the nature and extent of fiduciary duty depend upon the circumstances and the relationship of the parties in each case. Where the problem concerns duty of majority stockholders to the minority, or, more specifically, as here, parent corporation to minority stockholders of its subsidiary the 'basic question is almost always one of fact: Were the minority stockholders fairly treated?' Abelow v. Midstates Oil Corp., 41 Del.Ch. 145, 189 A.2d 675; Western Pacific R. R. Corp. v. Western Pacific R. Co., 9 Cir., 197 F.2d 994, 1000. And see article in 74 Yale Law Journal 338 entitled 'Corporate Fiduciary Doctrine in the Context of Parent-Subsidiary Relations.' The test to be here applied, therefor, is that of fairness."

Getty relies on *Meyerson* and similar cases.[2]

Those cases involved the filing of consolidated income tax returns by a parent and a controlled subsidiary. In *Meyerson* a profit-parent and its loss-subsidiary qualified under the Internal Revenue Code to file consolidated income tax returns. Consolidated returns were filed and resulted in substantial tax savings which were retained in their entirety by the parent. Concluding that it would be impossible to determine what would be a fair allocation of such tax savings, the Court decided that the business judgment rule applied and that absent a showing of "gross and palpable overreaching" the parent's decision refusing any allocation should not be disturbed. The Court took special note of the holding in *Western* that nothing in the Internal Revenue Code or the Regulations compelled a conclusion that a tax saving resulting from the filing of a consolidated return "must or should inure to the benefit * * * of the company which has sustained the loss that makes possible the tax saving." (197 F.2d at 1004.) Getty argues that under *Meyerson*, its decision to retain the entire allocation for itself should not be set aside absent a showing of gross and palpable overreaching.

The law stated in *Meyerson* is the Delaware law and I apply it here, but significant differences in the facts lead to a different result. For example, in *Meyerson* the Court noted, as I have said, that nothing in the tax laws indicated a Congressional desire that "savings" resulting from consolidated filings should be apportioned between parent and subsidiary. Here, to the contrary, § 3(b) (1) of Presidential Proclamation 3279 specifically directs that regulations promulgated by the Administrator "shall provide, to the extent possible, for a fair and equitable distribution among persons having refinery capacity." Skelly is a "person" and it seems to me that in considering equitable duties, § 4(g) of the Oil Import Regulations must be read in light of this directive.

There is a second difference of fact. The filing of consolidated income tax returns is optional under the Internal Revenue Code. (It is conditioned on the consent of each affiliate.) Here, to the contrary, the Regulations are mandatory as to when an allocation shall be made on behalf of more than one company. If one refiner is "owned or controlled" by another, both are "regarded as one" and an allocation for both *must* be made regardless of whether any party on whose behalf the allocation is granted favors or consents to such an allocation.

1. Cited with approval by the Delaware Supreme Court in Wolfensohn v. Madison Fund, Inc., 253 A.2d 72 (1969).

2. Western Pac. R. Corporation v. Western Pa. R. Co., 85 F.Supp. 868 (D.C.N.D. Cal.1949), aff'd 197 F.2d 994 (9 Cir., 1951) ; 9 Cir., 206 F.2d 495; Case v.

New York Central Railroad Company, Sup., 232 N.Y.S.2d 702, aff'd 15 N.Y.2d 150, 256 N.Y.S.2d 607, 204 N.E.2d 643 (1965); and Alliegro v. Pan American Bank of Miami, 136 So.2d 656 (Fla.Dist. Ct.App.—1962), cert. denied 149 So.2d 45 (Fla.Sup.Ct.—1963).

There is yet a third difference between the cases and this is of persuasive significance in an equity case. In *Meyerson* the subsidiary suffered no loss of anything it would otherwise have received, absent a subsidiary status. This was so because the subsidiary had no present profits nor a reasonable expectation of future profits against which it could offset its losses. In short, there was no showing of harm or loss to the subsidiary as a result of the consolidated filing.[3] Filing a separate return would not have provided any benefit or saving which it claimed to have lost. So, while the subsidiary gained nothing financially as a result of the consolidated filing, the Court found it also lost nothing. Here the situation is quite different. But for Getty's controlling interest in Skelly, the latter would be entitled to a separate quota. Thus Getty's dominance smothers Skelly's opportunity for independent recognition. And that opportunity would be a "right" under the Proclamation and the Regulations. In brief, that is a "loss" of benefit or right which calls for equitable adjustment. And the discussion comes full cycle when we return to Regulation 4(g) which directs that allocations "be made to the controlling person [Getty] on behalf of itself and its subsidiary [Skelly]."

There is one other distinguishing factor which is worth noting. In *Meyerson* the Court found it impossible to determine what a fair allocation of the tax benefits would be and so invoked the business judgment rule. Here the Court need look no further than the fairness test because an apportionment formula approximating "what fair arm's-length bargaining would probably have yielded," Western Pac. R. Corp. v. Western Pac. R. Co., 345 U.S. 247, 277, 73 S.Ct. 656, 671, 97 L.Ed. 986 (1953) (dissenting opinion), is available.

Most of my reasons for agreeing with Skelly's argument appear in the discussion of *Meyerson*. It is quite true that Getty's quota is based entirely on its historical import experience, to which Skelly makes no contribution. This is to say that mechanical application of the formula gives Getty what it gets without any reference to Skelly. If we stopped reading at that point and made no further analysis of the facts, Getty's argument would be persuasive. But, in my judgment, fairness requires that we read on and consider the other facts.

I see no reason for further discussion of the arguments made by Getty, all of which have been considered. The conflict, unique in its facts, essentially calls for the application of equitable principles and these require that Getty be directed to apportion any allocation it has received on behalf of itself and Skelly with Skelly. Counsel for Skelly has suggested a formula for this which is not challenged by Getty and it seems reasonable to the Court.

## IV

In summary, I agree that Getty's control of Skelly is not actionable *per se*. 8 Del.C. § 123. Orzack v. Englehart, 41 Del.Ch. 361, 195 A.2d 375 (1963). This is to say that majority corporate control, as an abstract fact, may not be the basis of liability. But such control gives rise to a fiduciary duty by the controller to be controlled and that means, for present purposes, a duty to be fair. The question then is whether such a duty requires a sharing of the quota allocation under the record facts of this case and that calls for an equitable judgment. I am persuaded that it does because (a) the purpose of import controls is to establish a fair sharing of imported oil among eligible "persons"; and (b) Skelly qualifies in all respects as an independent participant in such sharing except; (c) that under the Regulation it is "regarded as one" with Getty; and (d) that excep-

---

3. The subsidiary was a wasting asset corporation, operating annually at a loss, with little if any prospect of future profit.

tion is directed toward maintaining the integrity of the Regulations and so does not legally affect Skelly's status;[4] and (e) the allocation is made by the Government to Getty "on behalf of itself and" Skelly; and (f) the cumulative effect of this outweighs the fact that during the transition period the quota assigned to Getty is actually computed on the historical basis.

For the reasons stated herein I conclude that Getty has a duty to share its allocation with Skelly and, accordingly, summary judgment will be granted on Skelly's motion and denied on Getty's motion.[5]

4. Under the Regulation a parent and its controlled subsidiary are regarded as a single entity because an allocation based on input is determined pursuant to a sliding scale; the applicable percentage decreases as total crude input into the refinery increases. Separate allocation to the same corporate complex would nullify the decreasing percentage concept.

5. Getty, of course, will benefit in accordance with its stock position as a result of any import quota which actually becomes available to Skelly.