Bergan, J.
Plaintiffs are minority stockholders of Mahoning Coal Railroad 'Company, an Ohio corporation, which owns railroad lines in Ohio and leases lines in Pennsylvania. Mahoning does not operate the lines, but rents them to New York Central Railroad Company which pays it a rental of about 40% of the gross revenues from traffic on those lines.
*154 Central pays all expenses of operating and maintaining Mahoning’s lines, including taxes on the property, except Federal income taxes (Brainard v. New York Cent. R. R. Co., 242 N. Y. 125). Thus Mahoning has no operating expenses and is bound to make a profit as long as Central is its lessee, whether or not that operation is profitable to Central.
In August, 1955 Central and 34 of its subsidiaries entered into an agreement “ for the Allocation of the Federal Income Tax Liability Among the Members of the New York Central Railroad Company Affiliated Group ”.
The agreement sought in a systematic and regular way to take advantage in future years of an amendment to the Internal Revenue Code of 1954 which authorized filing of consolidated returns where there was 80% of stock ownership of one corporation by another. The statute previously had required 95% of ownership for this purpose. Advantage also was sought to be taken for this purpose of the elimination in that year of the 2% surcharge on railroad income reported in a consolidated return. (See Internal Revenue Code [as amd. in 1954], §§ 167, 168, 1502, 1503, 1504, and especially § 172, subd. [b], par. [1], cl. [C], and § 1501. These provisions were in effect during the years 1954-1962.)
The agreement does not expressly require all the parties to file a consolidated return in any year but contemplates that consolidated returns will ordinarily be filed; and it provides for allocation of tax liabilities and advantages of consolidated returns among the participants.
It may be described for the needs of this appeal by saying that corporations showing losses were to be reimbursed for a portion of their losses measured by a substantial part of the tax reductions obtained by profit companies; and the profit companies would gain the benefit of a proportion of the tax savings resulting from this utilization of the losses of the others.
For many years Central owned a majority of Mahoning’s common stock. In 1955-1956 it owned about 74%. In 1956 Central referred to Mahoning’s board of directors a proposal that Mahoning agree to include itself in the tax allocation agreement, if Central acquired the necessary 80% of stock ownership; this was assented to by the board in December, 1956; Central acquired the necessary stock by September, 1957 and in December *155 of that year Mahoning’s board of directors approved the allocation agreement. The board of directors of Mahoning is composed entirely of Central officers or employees, with one exception. The approval of the agreement was unanimous. The contract was consistent with Federal tax laws.
The result of Mahoning’s joining in the allocation agreement for the tax years 1957 to 1960 was that by utilizing Central’s losses in those years Mahoning was relieved of payment of $3,825,717.43 in income taxes which it would have paid on filing separate returns. Under the formula provided in the agreement Central received from Mahoning $3,556,992.15 and Mahoning retained the difference of $268,725.28 between this amount and the tax it would have paid on separate returns.
This action is by minority stockholders of Mahoning to rescind the agreement and to compel an accounting for the entire amount by which Central benefited from the arrangement during the three tax years at issue, on the ground that Central, in control of Mahoning’s board of directors, acted in a fiduciary capacity and, in the words of respondent’s submission to this court, 11 a fiduciary parent corporation cannot retain the benefits of an unfair agreement ”.
The decisive issue in the case, then, is whether this was an agreement unfair to Mahoning. The court at Special and Trial Term after a careful examination of the problem at a trial determined that it was not unfair; a majority at the Appellate Division ruled that it was unfair and a judgment directing Central to account for all the money received from Mahoning under the agreement has been entered. A minority in the Appellate Division were of opinion the agreement was fair to Mahoning.
As to past events the agreement is, by the decision of the Appellate Division, completely avoided and Mahoning has been placed in a position of having to pay no income tax on its income during the years in question; and Central, in the position of having to repay to Mahoning a substantial part (about 93%) of the income taxes Mahoning would have paid had it filed separate returns. This results in the rather unusual status of tax advantage where, instead of paying income taxes, Mahoning gets money in hand substantially equivalent of what it would have paid had it paid.
*156 As to the future operation of the agreement, the Appellate. Division left the question open as to what would be a fair allocation, but it observed that “ a total appropriation of the savings by Central is not fair”. The order entered by the Appellate Division does not actually rescind the agreement itself, but the order provides that the allocation agreement “is declared to. be not fair and not enforceable to the extent that it permits the allocations heretofore made of Federal income tax savings consequent on the filing of consolidated returns ”.
Exercising, as it did by its majority stock ownership, effective control over Mahoning’s affairs, Central was required to follow a course of fair dealing toward minority holders in the way it managed the corporation’s business. It could not use its power to gain undue advantage to itself at the expense of the minority. This is the standard of responsibility of corporate officers who, in a relationship of this kind, are able to exert this kind of a corporate power as it has been laid down in many cases.
A basic ground for judicial interference with corporate decisions on complaint of minority interests is an advantage obtained by the dominant group to the disadvantage of the corporation or its minority owners. This, of course, in the way of doing, can take many forms and follow greatly diversified directions, but the reflex of gain by the use of corporate power against loss to the corporation itself is a common denominator of the decided cases.
Thus, illustratively, in the recent decision in Ripley v. International Rys. of Cent. America (8 N Y 2d 430 [1960]), the fruit company Avhich Avas in a position to exert practical control over a railway used its poAver to obtain freight rates at once to its advantage and the disadvantage of the railway and its minority stockholders; and this misuse of power Avas the basis on which judicial relief aves granted.
In Kavanaugh v. Kavanaugh Knitting Co. (226 N. Y. 185), in which minority stockholders sought to enjoin the dissolution of a corporation, CIoT/nm, J., construed the complaint as pleading (p. 197) “ the inference that the directors conceived and progressed the scheme of dissolving the corporation, irrespective of the welfare or advantage of the corporation and of any cause or reason related to its condition or future, through the desire and determination to take from the corporation and to *157 secure to themselves the corporate business freed from interference or participation on the part of the plaintiff.” This is a statement in quite classic terms of the kind of misuse of corporate power which will invite judicial interposition.
In the same direction is Godley v. Crandall & Godley Co. (212 N. Y. 121), where the majority voted its members excessive salaries; and, for the purpose of excluding the minority from participation, voted to dissolve the corporation and turn over its business to another corporation from which the minority was excluded. See, also, in the same direction Farmers’ Loan & Trust Co. v. New York & Northern Ry. Co. (150 N. Y. 410).
An example of one of the kinds of unfair dealing which will justify relief is illustrated in Globe Woolen Co. v. Utica Gas & Elec. Co. (224 N. Y. 483) where a director of a utility having large interests in plaintiff manufacturing company participated in the approval by the utility of a special contract for electric power and a comparative cost guarantee to the manufacturing company grossly unfair to the utility, with a special knowledge of the danger to the utility in making such a contract with Ms company.
In commenting on the effect of the challenged contract Judge Cardozo noted that “ The unfairness is startling, and the consequences have been disastrous.” Of the duty of the director, occupying two roles, to communicate to his fellow directors his knowledge of the true nature of the agreement, the opinion continued : ‘ ‘ He may have trusted to the superior technical skill of Mr. G-reenidge to compute with approximate accuracy the comparative cost of steam and electricity. But he cannot have failed to know that he held a one-sided contract, which left the defendant at his mercy ” (p. 491),
A common thread showing undue advantage laid off against loss of advantage runs through these cases and harmonizes their holdings. There are exceptions, but in the absence of this kind of disparity the business judgment of corporate officers will not be interfered with (see, e.g., Everett v. Phillips, 288 N. Y. 227; Espach v. Nassau & Suffolk Light. Co., 293 N. Y. 463).
The arrangement made by Central had greater advantage to itself than to Mahoning. But there was no loss or disadvantage to Mahoning. The basic complaint of Mahoning’s minority is that they should have gotten a larger share of the benefits of *158 Central’s tax losses than the agreement gave them. Plaintiffs do not spell out what would he the right amount.
The Judge at Special and Trial Term regarded the agreement as fair; the Appellate Division, as we have noted, was divided in opinion. It is true enough that in the years under scrutiny Central gained very large proportionate advantages in relation to Mahoning’s advantage. But the agreement must be looked at with the knowledge which those who entered into it had when it was executed; and even the Appellate Division majority felt itself unable to say what would be a fair proportion of the distribution of Central’s tax loss looking forward from the date of judgment.
Had the agreement not been signed at all, Mahoning would have paid the Government in taxes $268,725.28 more than it paid Central on being relieved of all tax liability. It gained this much; Central gained much more; but the pattern of managerial disloyalty to a corporation by which the stronger side takes what the weaker side loses is entirely absent from this record.
Moreover, Central could not have taken advantage of the consolidated return provisions of the Federal statute unless it were suffering substantial losses and the stockholders of Mahoning had a vital interest in Central’s continued ability to pay the rent and operate the lines owned and leased by Mahoning; If that ability failed the entire profit basis of Mahoning’s business might have fallen in jeopardy.
Thus, without loss to itself, and, indeed, at the equivalent of a fairly substantial rebate of its tax obligation, Mahoning was able to help a lessee suffering losses whose solvency was vital to Mahoning’s interests. The argument of plaintiffs that Central got too large a share is not on this record a demonstration of such unfairness as to warrant judicial intervention.
Besides this, the loss shown by Central was under some rather flexible circumstances an asset to Central. It could have been carried forward for seven years (Internal Revenue Code [1954], § 172, subd. [b], par. [1], cl. [C]) and there is nothing about the financial history of Central to suggest that it was clear in 1957 when the agreement was made by Mahoning that Central itself could not have believed it would have carried forward and utilized the loss in future years.
*159 No such faithlessness of the majority of/Mahoning directors to its corporate interests has been demonstrated as to warrant judicial interference with the challenged corporate decision.
The order of the Appellate Division should be reversed and the judgment of the Special and Trial Term reinstated, with costs in this court and in the Appellate Division, and the question certified answered in the affirmative.
Chief Judge Desmond and Judges Dye, Fold, Van Voorhis, Burke and Scileppi concur.
Order reversed, etc.