GETTY OIL COMPANY, a Delaware corporation, Plaintiff Below, Appellant,

v.

SKELLY OIL COMPANY, a Delaware corporation, Defendant Below, Appellee.

SKELLY OIL COMPANY, a Delaware corporation, Defendant Below, Appellee and Cross-Appellant,

v.

GETTY OIL COMPANY, a Delaware corporation, Plaintiff Below, Appellant and Cross-Appellee.

Supreme Court of Delaware.

June 1, 1970.

Henry M. Canby and Richard F. Balotti, of Richards, Layton & Finger, William S. Potter and Charles S. Crompton, Jr., of Potter, Anderson & Corroon, Wilmington, and Hecht, Hadfield, Hays, Landsman & Head, New York City, for Getty.

James M. Tunnell, Jr., Walter K. Stapleton and William O. LaMotte, III, of Morris, Nichols, Arsht & Tunnell, Wilmington, and Covington & Burling, Washington, D. C., for Skelly.

WOLCOTT, C. J., and CAREY and HERRMANN, JJ., sitting.

WOLCOTT, Chief Justice.

This is an appeal and cross-appeal from a declaratory judgment action brought by a corporate parent for the purpose of determining its duty, if any, to share oil import allocations with its subsidiary.

Getty Oil Company (Getty), a Delaware corporation, owns (through Mission Corporation, a publicly owned holding company) 71% of the stock of Skelly Oil

Company (Skelly). Skelly is also a Delaware corporation and the balance of its stock is publicly held. Both parties are in the business of refining and marketing crude oil and crude oil products; Getty as a coastal refinery and Skelly as an inland refinery.

Since Getty's acquisition of its interest in Skelly, the latter has continued is operations independently; its business dealings with Getty are both infrequent and limited, being no more than those it conducts with other major oil companies.

Until 1957, the importation of crude oil into the United States was uncontrolled. In that year, the Voluntary Oil Import Program was established, and crude oil importers were requested to limit on a voluntary basis, the importation of crude oil in accordance with certain allocations granted to them.

Getty is deemed to have participated in this program through Tidewater Oil Company with which it merged in 1967. Skelly, an inland refiner, did not import foreign crude oil during this program.

The Voluntary Program proved unsatisfactory and the Mandatory Oil Import Program was instituted by Presidential Proclamation in 1959. This provides for quotas on the importation of foreign oil, including, crude, and is under the direction of the Secretary of the Interior and an Administrator. The Mandatory Program calls for an allocation computed on the size of current refinery inputs (input basis). But as a transition from the Voluntary Program to the Mandatory Program, the Proclamation permits allocations to be based on a declining percentage of an importer's last quota under the Voluntary Program (historical basis), if that yields a greater quota than the input basis.

Getty, by virtue of its position through Tidewater Oil Company, applied for and received an allocation calculated on . its historical basis. Skelly, because it did not participate in the earlier program, applied for an allocation based on its input basis. It was awarded allocations in each of the years 1959 through 1966.* In June, 1967, the Administrator determined this allocation to Skelly to be improper under the Regulations because Skelly was a controlled corporation within the meaning of Section 4(g) of the Regulations which provides:

"(g) A person is not elegible individually for an allocation of imports of crude oil and unfinished oils or finished products if the person is a subsidiary or affiliate owned or controlled, by reason of stock ownership or otherwise, by any other individual, corporation, firm or other business organization or legal entity. The controlling person and the subsidiary or affiliate owned or controlled will be regarded as one. Allocations will be made to the controlling person on behalf of itself and its subsidiary or affiliate but, upon request, licenses will be issued to the subsidiary or affiliate."

Skelly objected and appealed to the Oil Import Appeals Board, claiming that it was not controlled by Getty and that it was entitled to a separate allocation pursuant to Section 4(g) or, in the alternative, it should be granted an allocation based on "special circumstances" under Section 21 of the Regulations. Both the Oil Import Appeals Board and, subsequently, the Federal District Court, affirmed the Administrator's determination. Skelly Oil Co. v. Udall, 288 F.Supp. 109 (D.D.C.1968). At the same time, Skelly attempted to have the Administrator grant it a license to import a portion of Getty's 1968 historical basis allocation which would equal Skelly's own refinery input. The Administrator ruled that in the absence of a request from

---

* As an inland refinery, it was uneconomic for Skelly to refine foreign crude oil by reason of transportation costs, so it sold its allocations to coastal refineries which could refine foreign crude oil economically.

Getty to issue a license for part of the allocation to Skelly, the license for the entire allocation must be issued to Getty. The Oil Import Appeals Board on appeal affirmed this position.

Since it had been thus determined that any allocation which Skelly is to receive must, under the program, come through Getty, Getty filed this action for a declaratory judgment. Skelly answered and counter-claimed, asking for an adjudication of the extent of Skelly's right to share in Getty's quotas for the importation of crude oil, and asking for an accounting of the damages it has sustained as the result of Getty's appropriation of all oil allocation for its own use. Both parties moved for summary judgment. The Court of Chancery rendered an opinion that Getty is obligated to share all future oil import allocations with Skelly and to account for its failure to share past allocations. After a hearing on the form of the judgment at which each party presented a formula for the apportionment of the allocations, the court adopted Getty's formula and entered judgment accordingly. Getty appeals generally from the judgment that Getty must share any part of the quota, and Skelly appeals from that portion of the judgment which contains the disputed portion of the formula for such sharing.

■■■ Before discussing the standard to be applied in determining the duty of a parent corporation to its subsidiary in business dealings, we note that the question is solely one of Delaware law. This is not the proper court to decide if the Mandatory Oil Import Program compels the conclusion that a parent must share its oil allocation with its subsidiary. Interpretation and enforcement of that federal question must be left to the various federal courts and boards charged with that responsibility. See Mandatory Oil Import Program Regulation § 21; American Hardware Corp.

v. Savage Arms Corp., 37 Del.Ch. 59, 136 A.2d 690 (Supr.Ct.1957); Standard Power & Light Corp. v. Investment Associates, 29 Del.Ch. 593, 51 A.2d 572 (Supr.Ct. 1947).

■■ Delaware courts have dealt with situations in which a parent corporation is required to be "fair" in its dealings with its subsidiary, insofar as those dealings affect the interests of minority shareholders of the subsidiary. In Meyerson v. El Paso Natural Gas Co., 246 A.2d 789 (Del. Ch.Ct.1967), the Court of Chancery stated in regard to corporate fiduciary responsibility:

"* * * the nature and extent of fiduciary duty depend upon the circumstances and the relationship of the parties in each case. Where the problem concerns [the] duty of majority stockholders to the minority, or, more specifically, as here, parent corporation to minority shareholders of its subsidiary the 'basic question is almost always one of fact: Were the minority stockholders fairly treated?' Abelow v. Midstates Oil Corp., 41 Del.Ch. 145, 189 A.2d 675; Western Pacific R. R. Corp. v. Western Pacific R. Co., 9 Cir., 197 F.2d 994, 1000. And see article in 74 Yale Law Journal 338 entitled 'Corporate Fiduciary Doctrine in the Context of Parent-Subsidiary Relations.' The test to be here applied therefor (sic), is that of fairness."

This seems to us to be the proper test, although the concept of "fairness" needs further analysis. Theoretically, the best definition of "fairness" in parent-subsidiary business dealings would be to require that the transaction between the two be reached as though each had in fact exerted its bargaining power against the other at arm's length. It is, of course, obvious that it is impossible, as between parent and subsidiary, to approximate what would have been agreed upon at arm's length. On the

other hand, it is possible to set outer limits on what is "fair".

There are two tests which have been applied by Delaware Courts to determine the limits of 'fairness' in parent-subsidiary business dealings. The test of 'intrinsic fairness' has been applied to parent-subsidiary business where the parent controls the making of the transaction and the fixing of its terms. Sterling v. Mayflower Hotel Corp., 33 Del.Ch. 293, 93 A.2d 107 (Supr.Ct.1952); David J. Greene & Co. v. Dunhill International, Inc., 249 A.2d 427 (Del.Ch.Ct.1968); Bastian v. Bourns, Inc., 256 A.2d 680 (Del.Ch.Ct.1969), aff'd Per Curiam (unreported) (Del.Supr.Ct.1970). However, our courts have continued to apply the 'business judgment' test to actions of the parent where the terms of a parent-subsidiary transaction are not set by the parent but by a third party, usually the State or Federal Government. Such is the case here, where the transaction itself and its terms were fashioned by the Federal Government in the Mandatory Oil Import Program and not by Getty. Such was the case also in the consolidated tax return cases, where the consolidated return arrangement and the terms thereof were governed by the Federal tax laws.

This is the approach taken in *Meyerson,* supra, and the cases cited therein and approved by this Court in Wolfensohn v. Madison Fund, Inc., 253 A.2d 72, 76 (1969). Those cases involved the filing of consolidated tax returns by a parent and a controlled subsidiary. In *Meyerson,* a profit-parent and its loss-subsidiary qualified under the Internal Revenue Code to file consolidated income tax returns. A decision to file consolidated returns was made and the result was substantial tax savings which were retained in their entirety by the parent. Concluding that the arm's length measure was meaningless in parent-subsidiary transactions, the Court of Chancery decided that:

"The question, then, is reduced to one of business judgment with which the court should not interfere absent a showing of 'gross and palpable overreaching.'"

■ In the course of the instant case, there is an even clearer reason than in the tax cases to disregard the possibility of an affective arm's length test. Obviously, nonaffiliates could not be in the position of the parties here. And just as obviously, independent parties would not willingly negotiate to place themselves in the position of the parties here. Skelly, for over six years, successfully circumvented having to deal with Getty by applying for its own input allocation, and would now still prefer to obtain a separate allocation directly from the Federal Government. Getty, on its part, has nothing to gain at present from any dealing with Skelly under the Mandatory Oil Import Program.

The question then, as in *Meyerson,* becomes whether the subsidiary has demonstrated "a gross and palpable overreaching" on the part of the parent. We think not.

■ A basic ground for judicial interference with business judgment on the compliant of minority interests is an advantage obtained by the dominant group to the disadvantage of the corporation or its minority owners. —

This was recognized in Case v. New York Central Railroad Company, 15 N.Y. 2d 150, 256 N.Y.S.2d 607, 204 N.E.2d 643. *Case* was another minority stockholder's action which challenged the fairness of an allocation agreement whereby tax savings resulting from the filing of consolidated income tax returns could be allocated almost exclusively to the parent corporation.

The Court of Appeals reviewed several cases discussing the corporate fiduciary responsibility to subsidiaries, and then observed:

"A common thread showing undue advantage laid off against loss of advan-

tage runs through these cases and harmonizes their holdings. There are exceptions, but in the absence of this kind of disparity the business judgment of corporate officers will not be interfered with * * *."

On the basis that the arrangement involved had greater advantage to New York Central Railroad, but that there was actually no loss or disadvantage to New York Central's subsidiary, the Court of Appeals found nothing to warrant judicial interference with the challenged corporate decision.

■ We feel that *Case* is analogous to the present factual situation. Here, the arrangement caused by the Mandatory Oil Import Program, arguably at least, put Skelly at a disadvantage. But there was no advantage gained by Getty under the program because of its dominant position with Skelly.

From 1959, when the Mandatory Program went into effect to date, Getty has been awarded an allocation on the historical basis measured by the last allocation granted under the Voluntary Program to Tidewater. Any relationship between Getty and Skelly has been completely irrelevant to the allocation made annually to Getty.

■ Granted, the fact that the parent owes a fiduciary duty to its subsidiary, the duty does not require self-sacrifice from the parent. The parent corporation, too, has shareholders which it is bound to consider, and the parent's directors owe that corporation a fiduciary duty.

We are satisfied that in the present circumstances Skelly has failed to show "gross and palpable overreaching" which would warrant judicial interference.

In view of these conclusions, we do not reach Skelly's ground of appeal.

The order of the Court of Chancery is reversed.