**In re CORAL PETROLEUM, INC., Debtor.**

**Bankruptcy No. 83–02460–H2–5.**

United States Bankruptcy Court, S.D. Texas, Houston Division.

March 14, 1986.

See also, Bkrtcy., 50 B.R. 830, Bkrtcy., 62 B.R. 699.

Dennis J. Drebsky, William Gray, Sally Henry of Skadden, Arps, Slate, Meagher & Flom, New York City, Patrick L. Hughes of Sheinfeld, Maley & Kay, Houston, Tex., for Coral Petroleum, Inc.

Daniel H. Johnston, Jr., Brooke E. Smith of Ross, Banks, May, Cron & Cavin, Houston, Tex., for Official Creditors Committee of Coral Petroleum, Inc.

Bruce R. Zirinsky, Jacqueline Marcus of Weil, Gotshal & Manges, New York City, Alfredo R. Perez of Bracewell & Patterson, Houston, Tex., for Banque Paribas.

Susan J. Brandt, Diana L. Resnick of Boyar, Norton & Blair, Houston, Tex., for Phibro Corp.

Paul V. Swearingen, Houston, Tex., for Dorchester Sea–3 Products, Inc.

Robert C. Finley of Casson, Calligaro & Mutryn, Houston, Tex., for T.W. Oil.

James Ellis of Carrington, Coleman, Sloman & Blumenthal, Dallas, Tex., for Moore McCormack Petroleum.

Laurence J. Kaiser, Victor F. Keen, Ann-Elizabeth Purintun, Ingrid R. Sausjord of Kronish, Lieb, Weiner & Hellman, New York City, for United Refining Co.

Robert M. Noblitt of Dotson, Babcock & Scofield, Houston, Tex., for Official Creditors Committee of United Refining Co.

## MEMORANDUM OPINION

R.F. WHELESS, Jr., Chief Judge.

Coral Petroleum, Inc., a Texas corporation, filed a petition for relief under Chapter 11 of Title 11 of the United States Code (Bankruptcy Code) on June 2, 1983. Coral has acted as debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code, however the debtor has essentially not been operating its business. Three different plans of reorganization were respectively filed by the debtor, the Creditors'

Committee and Banque Paribas, but each plan was rejected by the unsecured creditors. Thereafter, the proponents of these three plans ("Plan Proponents") reached agreement and filed the Amended Joint Plan of Reorganization and Amended Joint Disclosure Statement on October 10, 1985. It is the confirmation of this Joint Plan that is in dispute, essentially on two issues.

First, an objection to the votes of certain "contingent claims" was filed by the Plan Proponents. In addition, a motion for continuance of the confirmation hearing, based on an administrative expense claim, was filed by the Creditors' Committee of United Refining Company, a former subsidiary of the debtor. The Court concludes, for the reasons discussed below, that the votes based on contingent claims are disallowed and that the objection of the United Refining Company Creditors' Committee is overruled. The Joint Plan is confirmed.

## OBJECTION BY PLAN PROPONENTS TO VOTES OF CONTINGENT CLAIMS

The Plan Proponents have objected to the "contingent" portion of the claims of defendants in preference actions commenced by the debtor pursuant to 11 U.S.C. section 547. The portion of these claims which is objected to is that part which is based on the "contingency" that the debtor successfully recover the full amount of the alleged preferences. The issue in dispute is whether this "contingent" portion of the claims of these defendants ("Pipeline Defendants")[1] is to be allowed for voting purposes, i.e., to the extent that they are based on the prospective recovery of preferences.

It is undisputed that the Pipeline Defendants have not complied with the requirements of section 502(d)[2] of the Bankruptcy Code, which requires that transferees of a preference turn over the preference related funds to the estate in order to have an allowed claim. These Pipeline Defendants deny the debtor's allegations and are vigorously defending against them. Nevertheless, these parties have filed "contingent" proofs of claim and are attempting to vote these "contingent" claims against the Plan. The Court concludes that section 502(d) deems the claims disallowed for voting purposes until defendants turn over the funds claimed.

## I. FACTS

The Joint Plan contemplates that a liquidating trust will be established and a trustee, proposed by the Creditors' Committee and approved by the Court, will collect and distribute virtually all of the assets of the estate. A substantial portion of the assets of the debtor potentially available for unsecured creditors are the funds recoverable through preference actions against the Pipeline Defendants. Preference claims in the amount of $110,000,000 are being asserted against all of the Pipeline Defendants.[3]

By order dated October 10, 1985, this Court approved the Disclosure Statement, set a deadline for voting on the Plan, and set a date for the confirmation hearing. Copies of the Joint Plan, Disclosure State-

---

**1.** The Pipeline Defendants whose claims are objected to are Dorchester Sea–3 Products, Inc., Moore McCormack Petroleum, Inc., Phibro Corporation, and T.W. Oil (Houston), Inc. Preference actions against these and other Pipeline Defendants were commenced during 1984 and are currently pending.

**2.** Section 502(d) provides: "Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has

paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 550, or 553 of this title."

**3.** The debtor argues that the motivation of the Pipeline Defendants is the belief that the Plan's liquidating trustee will be more likely to vigorously prosecute these preference claims than a Chapter 7 trustee. Since a $4,000,000 asset contribution by Banque Paribas is available only through the liquidating Plan and clearly makes the liquidating Plan more attractive than a Chapter 7 liquidation, this allegation appears to have some basis.

ment, Disclosure Order, and voting ballots were mailed to creditors and equity security holders, as well as to the Pipeline Defendants. Objections to confirmation of the Joint Plan were timely filed by the Pipeline Defendants.

At the confirmation hearing, the Plan Proponents submitted a certificate of acceptance from an accounting firm and showed by testimony that the Plan had been accepted by each impaired class other than classes 5 and 9, as well as by the class of equity security holders. The acceptances complied with the voting requirements of Bankruptcy Code section 1126 [4].

Class 5 consists solely of the allowed claim of Banque Arabe Internationale de Investissement (BAII), to the extent that it is secured by specific collateral. The claim of BAII was not voted. BAII has a claim in the amount of $445,000, and alleges a security interest in an account receivable. The value of the account receivable is presently the subject of litigation, however the validity of the security interest is not disputed. Any deficiency would be included in Class 9 (general unsecured claims), and would not control the vote in that class.

■ Evidence was offered to show that the Plan could be "crammed down", pursuant to section 1129(b) of the Bankruptcy Code, with respect to Class 5. That section provides that a plan can be confirmed notwithstanding the failure of each class to accept it if the other requirements of section 1129(a) are met, and "the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims and interests that is impaired under, and has not accepted the plan." The plan is deemed to be "fair and equitable" with respect to a class of secured claims if the plan provides that the holders of such claims receive the "indubitable equivalent"

of such claims. 11 U.S.C. § 1129(b)(2)(A)(iii).

The Joint Plan provides that BAII will be paid by surrender of the specific collateral consisting of the account receivable in which BAII holds a security interest. Since abandonment of the collateral to the creditor clearly satisfies indubitable equivalence,[5] the Plan is deemed to be fair and equitable with respect to Class 5. Thus, the Plan may be confirmed pursuant to section 1129(b) if the vote in Class 9 (general unsecured claims) is sufficient to constitute acceptance and the other requirements for confirmation set forth in section 1129(a) are met.

The votes cast by the Pipeline Defendants were initially included in the tabulation of Class 9, which class consists of all allowed unsecured claims. Initially, the amount of Class 9 claims which voted to accept the Plan was $72,286,593.31, or 16.98%, and the number of claims which voted to accept was 63, or 70%.

At the confirmation hearing, however, the Plan Proponents presented a letter from counsel for the Department of Energy (DOE) stating that although the DOE had voted as a Class 9 claimant in the amount of $293,886,535 to reject the Plan, the DOE was agreeable to withdrawing its vote if certain modifications were made by the Plan Proponents. These modifications were subsequently made and the DOE vote was withdrawn. Even after withdrawal of the DOE vote, the resulting vote is still insufficient to constitute acceptance by Class 9 unless the votes of the objected to portion of the pipeline preference claims are disallowed.

The Plan Proponents submitted an objection to the votes of the Pipeline Defendants based on the portions of their claims contingent on the successful recovery of the al-

---

**4.** Section 1126(c) provides that a class of claims has accepted a plan if it has been accepted by creditors that hold at least two-thirds in amount and more than one-half in number of the allowed claims of the class held by creditors that have voted on the plan. Section 1126(d) provides that a class of interests has accepted a plan if it has been accepted by interest holders

of at least two-thirds in amount of the allowed interests of the class held by interest holders that have voted on the plan.

**5.** Legislative history to section 1129 [124 Cong. Rec. H11,103 (Sept. 28, 1978); S17,420 (Oct. 6, 1978)].

leged preferential transfers by the estate.[6] The Plan Proponents contend that section 502(d) disallows claims based on potential preference liability unless the parties have surrendered the property sought to be recovered to the estate.

Specifically, the Plan Proponents request that the following adjustments be made to the tabulation of the balloting on the Joint Plan:

*Dorchester Sea–3 Products, Inc.:* Vote cast: $6,582,000. Amount attributed to potential preference liability: $6,452,700. Net Vote: $129,300.

*Moore McCormack Petroleum, Inc.:* Vote cast: $39,200. Amount attributed to potential preference liability: $39,200. Net Vote: $0.

*Phibro Oil Corporation:* Vote cast: $5,100,357. Amount attributed to potential preference liability: $4,897,857.50. Net Vote: $202,500.

*T.W. Oil (Houston), Inc.:* Vote cast: $24,253,517. Amount attributed to potential preference liability: $23,896,217. Net Vote: $357,300.

If these votes are disallowed, the resulting vote is sufficient to constitute acceptance by Class 9 under section 1126(c).

The Pipeline Defendants respond that section 502(d) is not operative until a judgment has been rendered on the preference actions. They contend that since their liability in the preference actions has not yet been determined, their claims are allowed pursuant to section 502(a). The amount of the claim can be estimated, or the entire amount can be temporarily allowed for voting purposes pursuant to Bankruptcy Rule 3018(a), which provides that "the Court after notice and hearing may temporarily allow [an objected to] claim or interest in an amount which the Court deems proper for the purpose of accepting or rejecting the plan."

6. Some of the Pipeline Defendants are scheduled creditors for debts not related to the potential preference liability. There is no objection to the votes of those parties based on claims not attributable to preferential transfers.

## II. LEGAL DISCUSSION

The Bankruptcy Code contemplates that the acceptance or rejection of the plan be made only by creditors [7]. The function of section 502(d) is to establish a debtor-creditor relationship by ordering the turnover of funds from a preferential transferee to the estate. Until the funds have been surrendered, the party is not a creditor of the estate to the extent of the alleged preferences.

The requirement suggested by the Pipeline Defendants that judgment first be rendered before section 502(d) becomes operative ignores the plain language and fails to effectuate the purpose of the Code section. Legislative history further emphasizes the requirement that preferential transfers be turned over prior to the claim being allowed:

> "[Section 502(d)] *requires disallowance* of a claim of a transferee of a voidable transfer *in toto* if the transferee has not paid the amount or turned over the property received as required under the sections under which the transferee's liability arises". (emphasis added)

House Report No. 95–595, 95th Cong., 1st Sess. 354 (1977); Senate Report No. 95–989, 95th Cong., 2d Sess. 65 (1978), U.S. Code Cong. & Admin.News 1978, pp. 5787, 5851, 6310.

Courts have consistently recognized that when an objection to a claim is based upon the ground that the claimant has failed to surrender a voidable transfer, "the claim can neither be allowed nor disallowed until the preference matter is adjudicated." *Katchen v. Landy*, 382 U.S. 323, 330, 86 S.Ct. 467, 473, 15 L.Ed.2d 391 (1966); *In Re Independent Clearing House Co.*, 41 B.R. 985, 1017 (Bankr.D.Utah 1984) ("the [preference] defendants' claims are not allowable pursuant to section 502(d) until after their fictitious profits and preferences have been surrendered to the estate."); *In Re*

7. Section 1126(a) provides that a claim must be allowed under section 502 in order to vote on the plan.

*First International Services Corp.*, 37 B.R. 856, 860 (Bankr.D.Conn.1984) ("claims of creditors who have received void or voidable preferences must be disallowed unless the creditor surrenders the money or property transferred during the preference period."); *In Re Mastercraft Record Plating, Inc.*, 32 B.R. 106, 8 C.B.C. 1268, 1271 (Bankr.S.D.N.Y.1983) ("[I]t cannot be disputed that a creditor's claim cannot be allowed if the creditor has received a preference or fraudulent conveyance unless and until the preference or fraudulent conveyance is surrendered."); *In Re Moriarty*, 22 B.R. 689, 690 (Bankr.D.Neb.1982) ("[I]rrespective of whether a transfer is actually avoided by any appropriate entity … a creditor with a voidable transfer may not have its claim allowed … until the transferee has paid the amount or turned over the property for which it is liable…").

The Pipeline Defendants nevertheless seek to convince the Court that it would be *equitable* to temporarily allow their claims for voting purposes pursuant to Rule 3018 prior to the adjudication of the preference actions. Their argument that the claims should be temporarily allowed hypothesizes the future recovery by the estate of the preferential transfers. To allow claimants to escape the turnover requirements of section 502(d) would enable them to request that the Court hypothesize liability for the purposes of having an allowed claim and simultaneously deny liability by refusing to surrender the funds. Section 502(d) forces preferential transferees into an economic position consistent with their alleged claim. If the preferences are eventually sustained *and* are paid over to the estate, then and only then will these claimants have an economic stake in the outcome of the proceeding. However, without the turnover of funds, the Pipeline Defendants have no present financial stake in the outcome of the Plan, they do not have a claim (to the extent of the transfers), and cannot vote a claim they do not have.

Envisaging the possibility that the Pipeline Defendants could defeat the prefer-

ence actions and never have a claim against the estate demonstrates the need for disallowance of their claims for voting purposes. Otherwise, the Plan could be defeated by those who never ultimately acquire an economic interest in its outcome.

 The bankruptcy court is empowered to attach appropriate conditions to the allowance of claims, including the power to require claimants to surrender their preferences or fraudulent conveyances before allowing their claim. *In Re Independent Clearing House Co.*, 41 B.R. at 1017 (citations omitted). The Court disagrees with the *Amarex*[8] decision cited by the Pipeline Defendants which temporarily allowed the votes of preference claims as "more in keeping with the spirit of Chapter 11 which encourages creditor vote and participation in the reorganization process." The temporary allowance of these claims would frustrate the purpose of the voting requirements in the Code, which is to protect the rights of legitimate creditors to determine the outcome of the plan. The express language of the Code rather than a consideration of the equities of the situation is the determining factor in this case. Congress has clearly provided in section 502(d) that the claims may not be allowed unless and until the preferences have been turned over to the estate.

Denying the Pipeline Defendants their preference related vote causes them no actual prejudice in distribution after they have turned over the preferential transfers to the estate. They will be entitled to distribution after and to the extent such funds have been returned to the estate.

 Accordingly, the Court holds that the claims of the Pipeline Defendants are presently disallowed for voting purposes to the extent of the amounts of the claims subject to preference allegations. Upon surrender of the funds to the estate, the order of disallowance shall be vacated, to the extent of any such payment, on motion of a party in interest.

---

**8.** *In re Amarex, Inc.*, 61 B.R. 301, 1985 (Bankr.W. D.Okla.).

## OBJECTION TO CONFIRMATION BASED ON CLAIM FOR ADMINISTRATIVE EXPENSE

The Creditors' Committee of United Refining Company ("URC") filed a motion for continuance of the confirmation hearing, based on its application for payment of administrative expense. The URC Creditors' Committee ("URC Committee") asserts a large administrative claim against the estate of this debtor. The contention of the URC Committee is that the debtor cannot pay all of its administrative claims, therefore the plan is not feasible. Thus, the issue of URC's claim for administrative priority was squarely put before this Court and has been heard as an objection to confirmation.

With respect to this claim, the contention is that the debtor must compensate URC, its former subsidiary, for the postpetition use of URC's net operating losses in filing consolidated tax returns. The debtor and URC were members of the affiliated group which filed the consolidated returns.

## I. FACTS

URC is a wholly owned subsidiary of United Refining Inc. ("URI"). The debtor, Coral Petroleum, Inc. ("Coral"), was a direct parent of URI from February 27, 1981 until August 30, 1985, when the stock of URI was sold in a foreclosure sale. Coral has a number of direct and indirect subsidiaries. URC has three direct and indirect subsidiaries: Kiantone Pipeline Corp., United Refining Co. of Pennsylvania, and Kiantone Pipeline Company. Coral Petroleum Industries, Inc., ("Industries"), a Hawaii

corporation, was the direct parent of Coral, and it (rather than the debtor) was the agent which filed consolidated tax returns for all of its affiliates (including URC and Coral) for the 1981 through 1984 tax years.

After suffering substantial losses, URC filed a petition for reorganization under Chapter 11 of the Bankruptcy Code on September 16, 1983. The URC Committee presently alleges that $19,000,000 is owed by Coral to URC as compensation for the use of URC's net operating losses by Industries and its subsidiaries in filing consolidated tax returns for the years 1983 and 1984. The claim is based on the following undisputed facts.

For the tax years ending August 31, 1981 through 1984, Coral and URC reported to the Internal Revenue Service as part of the consolidated income tax return filed by Industries, pursuant to 26 U.S.C. section 1501.[9] The consolidated group included various subsidiaries of both Coral and URI. Industries did not, for tax purposes, group its subsidiaries or affiliates with "Coral" in their names separately from those with "United" in their names.

The consolidated group received tax refunds in 1981 and 1982 of $7,990,985 and $20,780,268, respectively. The group paid no federal income tax, except for an investment tax credit recapture of less than $50,000, and received no tax refunds for the 1983 and 1984 tax years. Pursuant to Treasury Regulations Section 1.1502–79, the consolidated net operating loss was apportioned pro rata among the loss members of the group.

**9.** 26 U.S.C. section 1501 provides that:

An affiliated group of corporations shall, subject to the provisions of this chapter, have the privilege of making a consolidated return with respect to the income tax imposed by chapter 1 for the taxable year in lieu of separate returns. The making of a consolidated return shall be upon the condition that all corporations ... of the affiliated group consent to all the consolidated return regulations ... The making of a consolidated return shall be considered as such consent.

An "affiliated group" is defined as one or more chains of includible corporations connected through stock ownership with a common parent that is an includible corporation provided that two requirements are met:

(1) the common parent must directly own stock possessing at least 80 percent of the total voting power of at least one of the other includible corporations and having a value equal to at least 80 percent of the total value of the stock of the corporation, and

(2) stock meeting the 80 percent test in each includible corporation other than the common parent must be owned directly by one or more of the other includible corporations. *See* 26 U.S.C. § 1504(a).

No written agreement providing for the allocation of tax benefits and liabilities existed for the 1981 through 1984 tax years among Industries and any of its subsidiaries. However, for the 1981 and 1982 tax years, Industries made an intercompany allocation of credit for financial statement purposes. The allocation charged to each profit member of the group was approximately 47 cents for 1981 and 46 cents for 1982 for each dollar of its separate taxable income. Each loss member was credited approximately 47 cents in 1981 and 46 cents in 1982 for each dollar of its losses that was used to offset taxable income of other group members or carried back to produce a tax refund.

An entry was placed on the books of the debtor reflecting, as a receivable or payable, the liability or benefit allocated to each member of the consolidated companies for the 1981 and 1982 tax years. A corresponding entry was made on the books of the appropriate consolidated entity. No amounts have been paid by Industries or any of its subsidiaries with regard to the payables and receivables entered on the books of the consolidated companies, resulting from the intercompany credit allocation for 1981 and 1982.

As of August 31, 1985, the amount of unused net operating losses of URC and its subsidiaries available to be carried forward to succeeding taxable years was approximately $70,000,000. As of that same date, URC had unsecured debt, exclusive of interest, of approximately $125,000,000.

The URC Committee's contention that compensation for the use of URC's losses is now due from Coral is premised on two theories. First, that the financial accounting methods employed in 1981 and 1982 were a course of conduct which established an implied contract to compensate URC for use of its losses. Second, that Coral, as a parent, has a fiduciary duty to treat its subsidiary fairly. In other words, since Coral allegedly benefited from the use of URC's losses, Coral must return some form of compensation. The amount of compensation demanded is $18,000,000 for 1983 and $1,000,000 for 1984, which represents the amounts which would have been entered on the books of URC and Coral if the allocation methods used in 1981 and 1982 had been employed in 1983 and 1984.

The URC Committee further contends that its claim is entitled to administrative expense priority under section 503(b) of the Bankruptcy Code because the tax benefit resulting from the use of URC's losses for the years 1983 and 1984 allegedly benefited Coral's post-petition estate.

Debtor responds that there is no legal basis for awarding compensation among affiliate companies for the use of net operating losses. According to Coral, the Court should not interfere with the parties' business judgment by imposing such an allocation agreement.

## II. LEGAL DISCUSSION

### A. Value of the net operating losses as an asset of URC

Preliminarily, the Court notes that the Internal Revenue Code and Regulations do not address the question whether compensation is to be provided for the use of net operating losses in filing a consolidated tax return. Before the Court assesses the legal theories set forth as the basis of the URC Committee's claim for compensation, it is pertinent to consider the allegation that URC has been deprived of a valuable asset.

Net operating losses can be carried forward to offset future income for fifteen years.[10] According to the URC Committee, this ability to reduce future profits is a valuable asset of URC. The debtor allegedly deprived URC of this asset to the extent of the use of URC's net operating losses in the consolidated returns.

The value of the net operating losses as an asset to URC derives from URC's ability

---

10. 26 U.S.C. § 172(b)(1)(B). Pursuant to section 172 of the Internal Revenue Code, net operating losses are first carried back before they can be carried forward. The carryback provisions are inapplicable to URC's tax situation.

to either generate future profits or to market the net operating losses for use by another profitable company. This value is conditioned upon the contingency that the net operating losses survive certain Internal Revenue Code provisions intended to prevent "trafficking" in losses.

### Profitability of URC

An evaluation of URC's financial condition reveals that the likelihood that URC will generate sufficient profits to absorb its net operating loss carryforward is doubtful for several reasons. First, URC currently has a $70,000,000 net operating loss and there is no indication of the company's future profitability. There is, in fact, a substantial excess of availability of independent refinery plants, and approximately eighty of them have closed across the country. Second, the company currently has $125,000,000 in unsecured debt. Service of the interest on this debt prevents the company from having a profit at the present time. In addition, the location of the URC plant is not convenient to any easily available source of raw product. The product cannot be readily shipped in as in the Gulf Coast area. Finally, the source of raw product, which is in Canada, has repeatedly threatened to cut off supply. Taking these facts into consideration, any prediction of earnings in the near future for URC would be speculative.

### Internal Revenue Code provisions

A change in ownership resulting from either URC's Chapter 11 reorganization or a future acquisition might cause the reduction or elimination of the net operating losses. Section 382 was added to the Internal Revenue Code in 1954 to establish objective tests intended to curb "trafficking" in corporations with unused net operating losses. Section 382 was amended by the Tax Reform Act of 1976, however the effective date of the 1976 Act amendments has been repeatedly delayed. Although the amended section became effective on January 1, 1986, Congress may repeal the effective date of the amendments. The 1976 Act amendments have been the subject of extensive criticism, and further revision of section 382 is presently contemplated by Congress.[11] The proposed revision is intended to reduce the number of circumstances in which net operating loss carryforwards can be used as a device for transferring tax benefits.[12]

Section 382, both as previously in effect and as modified by the 1976 Act amendments, incorporates two sets of rules for limiting the utilization of net operating losses. One set of rules applies in cases of changes of ownership by taxable stock purchase or redemption, and the other set of rules applies to acquisitions by certain tax-free reorganizations.[13]

---

**11.** Tax Reform Bill of 1985, H.R. 3838 (bill passed by House of Representatives, currently under review by Senate).

H.R. 3838 would impose limitations after a change in ownership of more than 50 percent of the value of stock in a loss corporation, however effected. The taxable income available for offset by pre-acquisition NOLs would be limited to a prescribed rate times the value of the loss corporation's equity. In addition, NOLs would be disallowed unless the loss corporation satisfied the continuity of business enterprise rule for the two-year period following an ownership change (i.e., the corporation must continue the loss corporation's historic business or use a significant portion of the loss corporation's assets in a business).

**12.** Tax Reform Bill of 1985, House Ways and Means Committee Report at 256 (Commerce Clearing House).

**13.** Under the prior section 382, in the case of redemptions and acquisitions by purchase, the

carryover of NOLs was disallowed if (1) more than 50 percent of the stock of the loss corporation changed ownership within two taxable years, and (2) the loss corporation did not continue to carry on substantially the same trade or business after the change in stock ownership.

The 1976 Act amendments tighten the limitations applicable to taxable acquisitions by removing the requirement that the historic trade or business of the loss corporation be discontinued before the limitations on carryovers apply. Under the 1976 Act amendments, the limitations are triggered solely by a change in more than 60 percent of the stock ownership within a three year period, as a result of certain direct or indirect acquisitions of ownership or a decrease in outstanding stock. Once the required change in stock ownership occurs, NOL carryovers are gradually eliminated as the percentage change in stock ownership increases from 60 percent to 100 percent.

Under section 382(b) as previously in effect, the special limitations applied in the case of a

In addition to the objective limitations contained in section 382, the carryover of net operating losses may be disallowed under section 269 if the principal purpose of an acquisition of a corporation is tax avoidance by securing the benefit of the losses. In addition to these statutory limitations, the ability of an acquiring corporation to benefit from the tax attributes of a target corporation by joining with the target to file a consolidated income tax return is limited to some extent by the change of ownership and separate return limitation year ('SRLY') rules (Treas. reg. sec. 1.1502–21(c)).

It is possible that all of URC's net operating losses may have already been reduced or eliminated. On August 30, 1985, the stock of URC's sole shareholder, URI, was foreclosed upon by the secured lender, thereby indirectly changing all of the ownership interest in URC. This stock was subsequently sold to a third party. In addition, the plan of reorganization filed in the URC Chapter 11 case allegedly provides for the elimination of the equity interest of URC's shareholder, URI. (Confirmation of a plan in the URC case has not yet occurred). It is unclear at present whether these changes in ownership would result in application of the limitations imposed by section 382.

*Marketability of the net operating losses*

The URC Committee attempted to establish through expert testimony that the losses would be valuable to URC in bargaining for an acquisition of the reorganized company. The URC Committee produced an investment banker, who had acted as a consultant in several acquisitions of loss companies through bankruptcy proceedings. However, the witness had never been involved with the acquisition of an oil refinery and possessed no special knowl-

edge of the oil industry. The witness was generally unfamiliar with URC's financial affairs and with the various factors which might affect the future profitability of URC. It was this witness's opinion that the net operating losses used by the consolidated group were worth the "higher end" of the range between $4,000,000 and $6,000,000.

The Coral Creditors' Committee thereafter offered the expert testimony of a witness who had formerly been employed by Standard Oil of California (Chevron) for 27 years. He subsequently was employed by Coral and, after Coral's acquisition of URC in 1981, he served as president and chief operating officer of URC. After his resignation in 1982, he became president of Independent Refining Corporation, which he took through a Chapter 11 reorganization.

This witness testified to the conditions in the oil industry from the time of Coral's acquisition of URC until the present; the effect of federal regulatory and other economic factors on the profitability of refining during this time period; and the impact of these various factors on the prospect for future profitability of independent refineries such as URC. The witness formed the opinion, from his experience and a consideration of these factors, that there was no likelihood of profitability for independent refineries during the next three to five years.

The witness further testified that he had been involved for more than two years, in an attempt to sell the Independent Refining Corporation for $9,000,000. Although Independent had a net operating loss of more than $70,000,000, he had received no offers to buy the refinery, which had saleable hard assets of $5,000,000 to $5,500,000. In other words, the company was unable to

tax-free reorganization only if there were an 80 percent change in the ownership of the loss corporation.

Under the 1976 Act amendments, the types of tax-free reorganizations to which section 382 applies are expanded significantly to prevent avoidance of the limitations. The shareholders of a loss corporation are required to receive at

least 40 percent of the acquiring corporation's stock for the NOLs to be allowed in full. If the loss corporation's shareholders acquire less than 40 percent of the acquiring corporation's stock, the NOLs available to the acquiring corporation are reduced as the loss corporation shareholders' percentage ownership in the surviving corporation declines.

sell the $70,000,000 net operating loss for the $3,500,000 value attributed by the company to the loss or for any amount of money.

The Court concludes that the unlikelihood of future profitability of URC combined with the possibility of elimination of URC's net operating loss by the tax laws make the value of the losses highly speculative. In addition, the testimony adduced at trial indicates that the prospect of obtaining an offer to buy an independent refinery, even with a substantial net operating loss, is difficult. A valuation of the losses used by the consolidated group would require an assessment of the impact of these various factors on the ability of the losses to be utilized in the future. However, in view of the Court's refusal to impose liability on Coral for the use of the losses, it is unnecessary to determine the actual value of the net operating loss at the present time.

### B. Implied contract

The URC Committee maintains that book entries made by Coral creating payables and receivables based on income and losses sustained during 1981 and 1982 constituted an implied in fact contract. It is alleged that this contract obligated Coral to compensate URC for the use of URC's net operating losses to offset income of the consolidated group. This argument is not supported by the facts.

For the tax years 1976 through 1982, Coral made book entries charging income members and crediting loss members of the consolidated group. In each year, assets and liabilities resulting from the credits and charges were entered as payables and receivables of Coral and each of its subsidiaries.

This accounting method was employed for the years 1981 and 1982, during which URC was a member of the consolidated group. In those years, there was a tax refund which was allocated among the members of the consolidated group in the same proportion that the various members' losses were responsible for the refund actually received. During 1983 and 1984, the Industries group had neither income tax liability nor a tax refund claim, consequently there was no reason for Coral to make book entries.

The payables and receivables were never paid or collected by Coral and there are no facts which convincingly establish the presence of an intent or agreement that payment would be made by Coral. The book entries were made merely for financial management purposes. The actual taxpayer and recipient of the refunds was Industries, the ultimate parent. Since Industries was run by a one-person staff in Hawaii, the books were more efficiently kept by Coral.

According to the URC Committee, whether or not Coral believed that Coral's intercompany payables would actually be paid is irrelevant. The Committee contends that the fact that the entries were kept in the same account as other intercompany transactions indicates to a third party that the credits were intended to be paid.

 The essence of an implied in fact contract, however, is mutual agreement and an intent to become obligated to another party where the agreement has not been expressed in words. See 1 S. Williston, a Treatise on the Law of Contracts § 3 (3d ed. 1957). The Supreme Court has defined an implied in fact contract as one "founded upon a meeting of the minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." Baltimore & Ohio R.R. Co. v. United States, 261 U.S. 592, 597, 43 S.Ct. 425, 426, 67 L.Ed. 816, 818 (1923). Accord, Porter v. United States, 496 F.2d 583, 590, 204 Ct.Cl. 355 (1974), cert. denied, 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 761 (1975); Algonac Manufacturing Co. v. United States, 428 F.2d 1241, 1255, 192 Ct.Cl. 649 (1970). Since there were never any payments made by Coral in accordance with the allocation entries, there was no reasonable expectation by URC that it

would ever be compensated for use of its losses by actual payment. Moreover, bookkeeping alone is insufficient to establish a duty to compensate for the use of the losses. *See Jump v. Manchester Life & Casualty Management Corp.*, 438 F.Supp. 185, 189 (E.D.Mo.1977) *aff'd* 579 F.2d 449 (8th Cir.1978). The fact that payables and receivables reflecting gains and losses were entered on Coral's books does not evidence a tacit understanding that Coral would continue this accounting method when the financial circumstances had changed or provide compensation for the use of URC's losses in the consolidated returns.

### C. Fiduciary duty

The URC Committee asserts, as an alternative to its implied contract theory, that Coral had a fiduciary duty to treat its subsidiary fairly. Coral allegedly breached this duty by utilizing the net operating losses without giving anything to URC in return. The question presented by the URC Committee is whether there is a fiduciary duty created by the intercorporate relationship to compensate a loss member of an affiliated group for the use of losses in filing consolidated tax returns.

This issue was explored extensively in *Western Pacific Railroad Corp. v. Western Pacific Rail Co.*, 197 F.2d 994 (9th Cir.1951), *reh'g denied* 197 F.2d 1012, *rev'd on other grounds*, 345 U.S. 247, 73 S.Ct. 656, 97 L.Ed. 986, *prior opinion aff'd*, 206 F.2d 495, *cert. denied* 346 U.S. 910, 74 S.Ct. 242, 98 L.Ed. 407 (1954). The parties in the case had filed consolidated returns for over thirty-five years. In each year, the consolidated tax liability was distributed pro rata to the profitable members of the group without paying the loss company compensation for the tax saved by the use of its loss. Due to a reorganization, the parent company lost its equity interest in one of the subsidiaries and then sued the subsidiary for compensation because the subsidiary had previously been able to offset tax liability due to the parent's losses. The parent contended that the dual officers violated their fiduciary duties to the parent

by failing to exact an agreement from the subsidiary requiring payment to the parent as a condition to its consent to file consolidated returns. The Court of Appeals held that a company which had its loss utilized for the benefit of the group does not have a right to compensation from those who benefited from the use of loss. Since no basis existed for finding fraud, unfairness, or overreaching, the business judgment of the directors and officers would not be overturned. The Court concluded that "nothing in the (Internal Revenue) Code or Regulations ... compels the conclusion that a tax saving must or should inure to the benefit ... of the company which has sustained the loss that makes possible the tax saving." 197 F.2d at 1004.

Upon further consideration of the *Western* case, the Court of Appeals affirmed its prior decision. The court viewed the agreement to file consolidated returns as the equivalent of an executed contract which did not include a provision for compensation, commenting that:

> [t]here are several unusual facets to this case, but perhaps the most unique is the paradoxical position of the appellant which seeks to confirm the acts of its officers and at the same time petitions the court to insert a provision in the executed agreement requiring the payment of tribute for its cooperation. How could the courts remake the contract for the parties? How could this court or the district court determine 'what fair arm's length bargaining would probably have yielded?' Bargaining presupposes negotiations to determine the maximum amount a buyer is willing to pay and the minimum amount a seller is willing to accept. Such activity is a matter of business administration, and is not a judicial function.

206 F.2d at 495. *See also Meyerson v. El Paso Natural Gas Company*, 246 A.2d 789, 791 (Del.Ch.1967).

■ Other courts which have considered the fiduciary duty owed from parent to subsidiary have refused to substitute an agreement for that of the parties. The

cases consistently hold that, in the absence of fraud or overreaching, the decision whether to compensate for tax savings is a matter of business judgment not to be disturbed by the court. *In Re All Products Company*, 32 B.R. 811 (Bankr.E.D.Mich. 1983); *Case v. New York Central Railroad Co.*, 15 N.Y.2d 150, 256 N.Y.S.2d 607, 204 N.E.2d 643 (1965); *Meyerson v. El Paso Natural Gas Co.*, *supra.*

The decisive factor in this case is whether facts are present which indicate fraud or overreaching by the debtor. No allegation of actual fraud has been made. The URC Committee has, instead, based its breach of fiduciary duty theory on constructive fraud presumed from the intercorporate relationship. However, fraud cannot be presumed from the intercorporate relationship, because "even the corporation which dominates its subsidiary, with the resultant fiduciary relationship, properly deals with its affiliate for profit as long as there is no overreaching or unfairness." *Western*, 197 F.2d at 1000. In the absence of a showing of actual fraud, no equitable justification exists for overturning the agreement of the parties.

The URC Committee fails to distinguish those cases where a share in a tax refund equal to an amount previously paid by the subsidiary in taxes was awarded. The recovery in those cases was not payment for taxes saved by the consolidated group, as is demanded here, but

> ... a tax refund resulting solely from offsetting the losses of one member of a consolidated filing group against the income of that same member in a prior or subsequent year [which] should inure to the benefit of that member.

*In Re Bob Richards Chrysler-Plymouth Corp. (Western Dealer Management Inc. v. England)*, 473 F.2d 262, 265 (9th Cir.), *cert. denied*, 412 U.S. 919, 93 S.Ct. 2735, 37 L.Ed.2d 145 (1973). *See also Jump v. Manchester Life & Casualty Management Corp.*, 438 F.Supp. at 189.

In *Richards*, the parent filed a consolidated return for itself and its subsidiary for the years 1965 and 1966. For the year 1966, the parent received a refund resulting from a net operating loss which could be carried back to offset taxes paid by the group in prior years. The refund was due entirely to the losses of the subsidiary. The court held that, in the absence of an express agreement to the contrary, the subsidiary was entitled to the entire refund, which was an amount that the subsidiary had previously paid in taxes. This was because "[a]llowing the parent to keep any refunds arising solely from a subsidiary's losses simply because the parent and subsidiary chose a procedural device to facilitate their income tax reporting unjustly enriches the parent." 473 F.2d at 265.

The court in *Jump* also awarded recovery of a share in a tax refund but limited it to the amount previously paid by the subsidiary in taxes. The subsidiary was not entitled to the refund of taxes paid by other consolidated members in prior years, even though the refund was attributable entirely to the subsidiary's losses. The case does not, therefore, lend support to the URC Committee's position. *Jump* held that the other members were entitled to benefit from the use of the subsidiary's losses in filing the consolidated returns without paying compensation. The fact that the parent carried the refund on its books as a sum due to subsidiaries, and the subsidiary in turn carried the same amount on its books as money due as tax refunds did not evidence an agreement to provide compensation. The district court deferred to the parties' judgment, noting that "(t)he I.R.S. Tax Code and Regulations do not specify how a tax refund is to be divided among affiliates." 438 F.Supp. at 189. On appeal, the Eighth Circuit affirmed the ruling of the district court, holding that the parent did not have any fiduciary duty to compensate the subsidiary for its continuing cooperation in the filing of consolidated returns.

■ A careful reading of the above decisions reveals, contrary to the URC Committee's assertions, that they were not based on the theory that a parent has a fiduciary duty to compensate a subsidiary for tax

saved as a result of the subsidiary's losses. The cases did not award compensation for *tax saved,* but held that a *tax refund* in an amount previously paid by the subsidiary should be turned over from the parent to the subsidiary. The analysis used by the courts was a theory of unjust enrichment. Allowing the parent to keep the refund which the subsidiary would have received if it had filed an individual return would unjustly enrich the parent.

Unjust enrichment requires a finding that one party has received a benefit at the expense of an innocent party, under circumstances which make it unjust to retain it. *Harris v. Sentry Title Co., Inc.,* 715 F.2d 941, 949 (5th Cir.1983). In the cases cited to the Court, the tax refund received by the parent was a tangible benefit which was rightfully owed to the subsidiary. In this case, however, there has been no benefit conferred upon Coral by URC. There was no tax refund in 1983 and 1984. Moreover, Coral's income tax liability was not diminished by the use of URC's losses because Coral had its own losses for the tax years 1983 and 1984. Any benefit conferred by use of URC's losses was realized only by profitable members of the affiliated group.

The Creditors' Committee nevertheless maintains that benefit accrued to Coral from the offsetting of income of Coral's subsidiaries. This argument requires the Court to disregard the existence of the various corporate entities for the purpose of imposing liability on Coral for the benefit conferred on its profitable subsidiaries, yet at the same time uphold the corporate separateness of URC, also a corporate affiliate, to enable URC to retain all benefits from the URC losses for URC's creditors. In addition, the Committee does not provide an explanation as to why it is alleged that the benefit accrued to Coral rather than to Industries, the ultimate parent.

Piercing the corporate veil is appropriate only when the separate legal identities of parent and subsidiary have ceased and the corporate fiction is utilized to achieve an inequitable result, or to con-

ceal fraud or illegality. *Miles v. American Telephone & Telegraph Co.,* 703 F.2d 193, 195 (5th Cir.1983); *Gentry v. Credit Plan Corp of Houston,* 528 S.W.2d 571 (Tex. 1975). Considering that no facts have been alleged or established which would support a finding that the corporate veil should be pierced, the Court finds the URC Committee's position to be without merit.

The Court concludes that neither the implied contract theory nor the fiduciary duty theory support a finding that compensation for use of the losses should be awarded. The objection to confirmation based on the application for payment of administrative expenses is therefore overruled. The claim for payment of administrative expense is disallowed. Since all other objections to confirmation have been overruled and the Joint Plan complies with the requirements for confirmation set forth in 11 U.S.C. section 1129(b), it is ordered that the Joint Plan is confirmed.