**In re GENERAL HOMES CORPORATION, FGMC, Inc., Debtors.**

**Bankruptcy Nos. 90–04810–H3–11, 90–00192–H4–11.**

United States Bankruptcy Court, S.D. Texas, Houston Division.

Oct. 30, 1991.

John F. Higgins, Sheinfeld, Maley & Kay, Houston, Tex., for debtor.

Leon Komkov, Milgrim, Thomajon & Lee, P.C., New York City, for Unsecured Creditors Committee.

William Schultz, Jackson & Walker, Houston, Tex., for The Bank Group.

Dean W. Ferguson, Peter Franklin, Locke, Purnell, Rain & Harrell, Dallas, Tex., for Shearson Lehmann.

Marilee Madan, Calvin, Dylewski, Gibbs, Maddox Russell & Verner, Houston, Tex., for GFC Holding Joint Venture.

James P. Moon, Simpson, Dowd & Moon, Dallas, Tex., Proposed Special Litigation Counsel for Unsecured Creditors Committee.

## MEMORANDUM OPINION

LETITIA Z. CLARK, Bankruptcy Judge.

The Third Amended Plans of Reorganization, as modified ("Plans"), of General Homes Corporation ("GHC") and FGMC, Inc. ("Debtors") were the subject of a lengthy and hotly contested proceeding. After considering the pleadings, the evidence, the arguments of counsel adduced at the hearings, and the post-hearing memoranda filed by the parties, the Court makes the following Findings of Fact and Conclusions of Law and enters a separate Order in connection herewith confirming the Debtors' plans. To the extent any findings of fact are deemed to be conclusions of law, they are hereby adopted as such. To the extent any conclusions of law are deemed to be findings of fact, they are hereby adopted as such.

### I. *Procedural History*

1. The GHC case began on July 10, 1990, with the filing of a Creditors' Involuntary Petition under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101, *et seq.* by S.N. Phelps & Co., Inc., Eleanora M. Crosby, and Howard E. Leppla against GHC. Eventually, GHC decided

not to contest the petition, and on August 14, 1990, this Court entered an unopposed Order for Relief. GHC has continued as debtor-in-possession during the pendency of this case.

2. On January 6, 1991, FGMC, a wholly owned subsidiary of GHC, filed its Voluntary Petition under Chapter 11 of the Code. FGMC has continued as debtor-in-possession during the pendency of its case. An unopposed order jointly administering the GHC and FGMC cases under Case No. 90–04810–H3–11 was entered on January 25, 1991.

3. On December 4, 1990, GHC filed a Motion to Extend 120–day and 180–day Exclusive Periods for Filing a Plan of Reorganization and Obtaining Acceptances Thereof, requesting an additional thirty-day extension of GHC's exclusive right to file its plan of reorganization and an additional sixty-day extension to solicit acceptances. No objections were filed to the First Motion to Extend.

4. An Order Extending GHC's Exclusive Right to File a Plan of Reorganization and to Solicit Acceptances Thereto Until January 10, 1991 and April 9, 1991, respectively, was entered on January 22, 1991.

5. On January 10, 1991, GHC and FGMC each filed a Plan of Reorganization together with a joint "[Proposed] Disclosure Statement Under 11 U.S.C. § 1125."

6. On February 28, 1991, GHC and FGMC filed a "[Proposed] First Amended Disclosure Statement Under 11 U.S.C. § 1125" together with separate First Amended Plans of Reorganization.

7. On March 7, 1991, GHC filed its Second Motion to Extend 180–Day Exclusive Period for Obtaining Acceptances of Plan of Reorganization ("Second Motion to Extend"). This was contested by the Committee of Unsecured Creditors. Following hearing an Order Granting Extension of 180–Day Exclusive Period for Soliciting Acceptances of Plan "to the conclusion of the hearing on confirmation set to begin June 20, 1991, and to continue thereafter until concluded by confirmation or denial of plan," was entered on July 11, 1991.

8. On March 25, 1991, GHC and FGMC filed a "[Proposed] Second Amended Disclosure Statement Under 11 U.S.C. § 1125" together with separate Second Amended Plans of Reorganization Under the United States Bankruptcy Code. Following hearings on March 26 and March 28, 1991, the Court entered its Order Under 11 U.S.C. § 1125 Approving Second Amended Disclosure Statement; Fixing Time for Filing Acceptances and Rejections of and Objections to Debtors' Second Amended Plans of Reorganization Under Chapter 11 of the United States Bankruptcy Code; and Setting Hearing on Confirmation.

9. On June 12, 1991, GHC and FGMC filed their Third Amended Plans of Reorganization, along with a Motion to Approve Modification to Second Amended Plans of Reorganization of GHC and FGMC. The Motion to Approve Modification to Second Amended Plans was granted in part. (See Docket No. 1190).

10. Several objections to confirmation of the GHC Plan were filed, including objections filed by Dr. Seymour Licht, E.R. Ltd., Shearson Lehman Brothers, Inc., Mortgage Fund IX, Douglas W. Scott, Burr Oaks Associates, Robert S. Lipson, and the Official Unsecured Creditors Committee.

11. The hearing on confirmation of the Third Amended Plans of Reorganization occupied fifteen days of court time.

## II. *Debtors*

12. GHC is engaged in the volume production and sale of moderately priced single-family homes and the development of related subdivisions. GHC is a publicly held company subject to the reporting requirements of the Securities and Exchange Commission.

13. As a part of its homebuilding operations, GHC's activities include the purchase and sale of developed and undeveloped land, and of architectural, landscape, and interior design services. Prior to the petition date, GHC conducted operations in four areas: Houston, Dallas–Fort Worth, Phoenix, and in Florida.

14. GHC has focused its marketing primarily on first-time home buyers and first

time "move-up" home buyers. It sells homes through its own sales staff in each subdivision as well as through outside real estate brokers. GHC's marketing includes the use of furnished, landscaped model homes, sales offices located in each model park, brochures, direct mail, and media advertising.

15. FGMC's primary business prior to the petition date was to assist customers of GHC in obtaining financing and to coordinate and expedite GHC's sales transactions beginning with the process of loan application through loan approval and closing.

### III. *Bank Group*

16. Prior to the filing of the Involuntary Petition, GHC entered into a Revolver Loan and Term Loans Agreement ("Old Credit Agreement") with Citicorp Real Estate, Inc.; Hibernia National Bank; Pittsburgh National Bank; The Valley National Bank of Arizona; Mellon Financial Services Corporation #7; American Savings and Loan Association of Florida; Chemical Bank; MBank Houston, N.A.; NCNB National Bank of North Carolina; Wells Fargo Realty Advisors, Inc; Southeast Bank, N.A.; and Lomas Mortgage USA, Inc. (the "Predecessor Bank Group").

17. GHC evidenced its obligations under the Old Credit Agreement by executing a promissory note payable to the Predecessor Bank Group in the principal amount of $316 million. GHC secured its performance under the Old Credit Agreement and note by granting a lien on most of GHC's assets, including substantially all of GHC's residential inventory, lots, unimproved land, home sales receivables, and MUD reimbursables.

18. GHC was able to sell assets subject to the Predecessor Bank Group's liens, and thus to convert such assets into cash, only upon receipt of lien releases from the Predecessor Bank Group.

19. As of March 31, 1988, GHC was in default under the Old Credit Agreement for failure to make certain payments and for violating certain covenants.

20. Between April 1988 and September 1989, GHC and the Predecessor Bank Group entered into various interim waivers, extensions and agreements and a temporary forebearance agreement in order to negotiate and implement a debt restructuring for GHC, all of which were superseded by the execution, on September 29, 1989 of the Amended and Restated Credit Agreement ("Credit Agreement").

21. GHC entered into the Credit Agreement and related agreements and loan documents with Citicorp Real Estate, Inc.; Bank One Texas, N.A.; Mellon Financial Services Corporation #9; NCNB National Bank of North Carolina; Lomas Mortgage USA, Inc.; American Savings and Loan Association of Florida; The Valley National Bank of Arizona; Pittsburgh National Bank; and Hibernia National Bank; ("Bank Group") whose agent under the loan documents is Citicorp.

22. The Credit Agreement provided for three loans: a $100 million revolving loan, a $90 million amortizing term loan, and a $60 million non-amortizing term loan, which together represented a restructuring of the approximately $250 million owed to the Predecessor Bank Group under the Old Credit Agreement. The amounts outstanding under the Credit Agreement continued to be secured by the collateral securing the indebtedness under the Old Credit Agreement.

23. Pursuant to the Credit Agreement, new liens were granted to the Bank Group on substantially all of the real estate assets of General Homes—Alabama, Inc. and the common stock of FGMC.

24. The security documents executed pursuant to the Credit Agreement granted to the Bank Group first and prior liens and security interests in and to all or substantially all real property assets of GHC, and certain other assets of GHC, including all of GHC's personal property located on or related to its real property assets, all of GHC's home sales receivables, MUD reimbursables and certain notes receivable, 100% of the common stock of FGMC, various deposits of GHC and proceeds.

## IV. *Noteholders*

25. GHC 15½% Notes were issued under an Indenture dated January 31, 1985 between GHC and MBank Dallas, N.A., as trustee. The net proceeds to GHC from the sale of the GHC 15½% Notes were approximately $48 million.

26. GHC 12¾% Notes were issued under an Indenture dated April 30, 1986 between GHC and MBank, as trustee. The net proceeds to GHC from the sale of the GHC 12¾% Notes was approximately $96 million. Bankers Trust Company is the successor trustee with respect to both issues of Notes.

27. The indentures of the two issues of Notes contain provisions subordinating the Notes to "Senior Debt."

28. The indentures define "Senior Debt" as: " 'Senior Debt' means (a) the principal of and premium, if any, and interest (including without limitation any interest accruing subsequent to the filing of a petition or other action concerning bankruptcy or other similar proceedings) on, and any fees in respect of, money borrowed by the Company (other than the Securities) or by others and guaranteed by the Company, whether currently outstanding or hereafter created, (b) indebtedness incurred by the Company in the acquisition (whether by way of purchase, merger, consolidation or otherwise and whether by the Company or another person) of any business, real property, or other assets, whether currently outstanding or hereafter created, (c) any other indebtedness, liability or obligation, contingent or otherwise, of the Company and any guaranty, endorsement or other contingent obligation in respect of any indebtedness, liability, or obligation of another created, assumed, or incurred by the Company after the date of this Indenture, which is, when created, assumed or incurred, specifically designated by the Company as Senior Debt, and, (d) any refundings, renewals, extensions, restructurings, amendments, modifications, of any indebtedness or other obligation described in clauses (a), (b), and (c) above; provided that Senior Debt shall not include (i) any indebtedness or other obligation of the types referred to in the preceding clauses (a) through (d) if the terms of the instrument creating or evidencing such indebtedness or other obligation does not constitute Senior Debt; (ii) any Nonrecourse Indebtedness; or (iii) any indebtedness or other obligation of the Company which is subordinate in right of payment or *pari passu* with the Securities."

## V. *Creditors Committee*

29. The United States Trustee appointed the Official Committee of Unsecured Creditors of GHC on September 4, 1990. At the request of Anthony B. Walsh, the United States Trustee reconstituted the Committee's membership on October 22, 1990. The members of the Committee are Karl R. Ziebarth, S.N. Phelps & Co., Dean Witter High Yield, Walsh (after reconstitution), See More Light Investments, Jackson National Life Insurance Co., and Bankers Trust Co.

30. All the Committee members are Noteholders except Bankers Trust Co., which is the indenture trustee with respect to both issues of Notes.

31. On June 19, 1991, the day before the commencement of the hearing on confirmation of the Third Amended Plans of Reorganization, As Modified, the Committee filed its Complaint for Equitable Subordination, Recharacterization of Debt, Recovery of Fraudulent Conveyances and Preferences, Damages, Fraud, Negligent Misrepresentations, and Other Legal, Declaratory, and Equitable Relief. The Complaint was designated Adversary Proceeding No. 91–4367.

## VI. *Plans of Reorganization*

32. The Third Amended GHC Plan of Reorganization divides the creditors into 23 classes and places all equity interest holders into one class. Of these 23 classes, 13 classes contain secured claims, secured by separate collateral. Three classes contain priority claims with differing priorities under the Bankruptcy Code; one class contains administrative claims; one class contains the secured claims of the Bank Group; and five classes contain unsecured claims.

33. Of the five unsecured creditor classes, one class contains the unsecured deficiency claims of the Bank Group (Class GHC–19); a second class contains trade debt (Class GHC–20); a third class contains claims of purchasers of GHC-built homes and claims arising from homeowner litigation (Class GHC–21); the fourth class contains the claims of the noteholders (Class GHC–22); the fifth class contains claims which are subordinated pursuant to a final court order or which arise from the rescission of a purchase or sale of securities issued by GHC and its affiliates (Class GHC 23).

34. Under the GHC Plan, Creditors in each of the General Unsecured Creditors and Other Unsecured Creditors classes (Classes GHC–20 and GHC–21) are to share pro rata in a trust, funded with approximately $1.5 million. Subordinated Creditors and Noteholders are to receive nothing on their claims. The Bank Group, on its unsecured deficiency claims, is to receive $11.5 million in cash, 90,000 shares of the reorganized Debtor, and the excess in certain segregated accounts representing unclaimed funds remaining after disbursements are made to other creditors.

35. The value to be distributed to the Bank Group on behalf of its secured claims is estimated by the Debtor (without contradiction in the evidence) to be approximately $121 million. Of that amount, the Bank Group will be paid approximately $30 million in cash; a new note with a face value of approximately $19.5 million; assets transferred to a liquidating trust having a value of $64 million; and preferred stock having a value of $7.3 million (Tr. 7/26/91, at 30–31).

36. Pursuant to the GHC Plan, key employees will be eligible to receive up to ten percent of the common stock of the reorganized Debtor through a stock option plan upon consummation of the Plan of Reorganization. The individuals eligible to participate in these stock options as key employees will be designated by senior management.

37. The GHC Plan contains a release of the Bank Group and each member of the Bank Group by the Debtor for all claims, demands, actions or causes of action, known, unknown, matured or unmatured, based on facts or events occurring through the date of confirmation.

38. The GHC Plan contains a release and discharge of all claims of the Debtor against, and liabilities by, of, and among, any officer, director, independent accountant, consultant, counsel, attorney, or employee of the Debtor acting in their individual capacity as an officer, director, independent accountant, consultant, counsel, attorney, or employee, for any matter or thing which is the basis of or relates, directly or indirectly, to any claim against the Debtor.

39. The GHC Plan retains the incumbent management of the Debtor to run the reorganized Debtor.

40. The GHC Plan is designed to permit the reorganized Debtor to be a much smaller, more efficient entity, the stock of which will not be publicly traded.

41. The FGMC Plan mirrors the GHC Plan, and is conditioned on confirmation of the GHC Plan. The Official Committee of Unsecured Creditors made its objection to the GHC Plan applicable to the FGMC Plan as well. The FGMC Plan appears on its face to meet the applicable confirmation standards of the Bankruptcy Code.

### VII. *Confirmation Hearing*

42. The hearing on confirmation was conducted pursuant to the Pretrial Order on Confirmation Hearing (Docket No. 1035). Five parties: Debtors, the Bank Group, the Committee of Unsecured Creditors, Shearson Lehman, and Dr. Seymour Licht, appearing *pro se*, presented evidence for or against confirmation of the Plans.[1]

---

1. Objecting parties E.R., Ltd., Ward, GFC Holdings, and Orlando et al, appeared through counsel on the first day of the confirmation hearing, but did not present evidence on the matter of confirmation. Orlando et al, moved to withdraw their objection. A compromise of controversy was approved with regard to GFC Holdings which removed the GFC objections to confirmation. The other parties did not formally withdraw their objections, but did not appear at the hearing.

## VIII. *Confirmability of the Plans*

■ 43. In addition to the consideration of objections raised by creditors, the Court has a mandatory independent duty to determine whether the plan has met all of the requirements necessary for confirmation. *Matter of Williams*, 850 F.2d 250 (5th Cir. 1988); *In re Holthoff*, 58 B.R. 216 (Bankr. E.D.Ark.1985).

■ 44. The bankruptcy court must consider the entire plan in the context of the particular facts and circumstances of the case. *In re D & F Construction, Inc.*, 865 F.2d 673, 675 (5th Cir.1989).

## IX. *Ballots*

45. The Debtor introduced a Summary of Ballots which reflects that all impaired classes eligible to vote voted to accept the GHC Plan. The Debtor later introduced an Amended Summary of Ballots, which indicates that several ballots were not counted. The Debtor did not count the ballots for those claims to which an objection to the Proof of Claim has been filed. The Debtor also did not count the ballots returned after the voting deadline established by the Order Under 11 U.S.C. § 1125 Approving Second Amended Disclosure Statement; Fixing Time for Filing Acceptances and Rejections of and Objections to Debtors' Second Amended Plans of Reorganization Under Chapter 11 of the United States Bankruptcy Code; and Setting Hearing on Confirmation.

46. The ballots filed reflect that the numbers contained in the Amended Summary of Ballots are correct.

47. There is no provision of the Bankruptcy Code or Rules determining which ballots are to be counted for the purposes of acceptance or rejection of a plan. There is a split of authority among the cases as to whether a claimant is automatically disenfranchised upon the filing of an objection to the claimant's claim.

48. At least one court has held that the filing of an objection cuts off the right to vote unless the court allows the claim temporarily pursuant to B.R. 3018(a). *See, In re M. Long Arabians*, 103 B.R. 211 (BAP 9th Cir.1989).

■ 49. Several courts have held that the question whether a claimant to whose claim an objection has been filed is entitled to vote is a matter left to the discretion of the court. *In re Amarex*, 61 B.R. 301 (Bankr.W.D.Okla.1985); *In re Goldstein*, 114 B.R. 430 (Bankr.E.D.Pa.1990); *In re Coral Petroleum, Inc.*, 60 B.R. 377 (Bankr. S.D.Tex.1986); *In re Pizza of Hawaii, Inc.*, 761 F.2d 1374, 1382 (9th Cir.1985). This court believes this to be the best approach to the issue.

50. Several creditors sought to have their claims temporarily allowed for purposes of voting on the GHC Plan. Those parties who sought this estimate had their claims estimated, and were permitted to vote for or against the GHC Plan. (*See* e.g. Docket Nos. 1063, 1215, 1216, & 1217.)

■ 51. The Second Amended Disclosure Statement provides: "Holders of Contested Claims and Interests are not entitled to vote on the Plans. Any Claim or Interest, to which an objection has been filed and remains pending, is not entitled to vote unless the Bankruptcy Court, upon motion by the Creditor or Interest holder whose Claim or Interest has been objected to, temporarily allows the Claim or Interest in an amount which it deems proper for the purpose of accepting or rejecting a Plan" (Debtor's Exhibit 3, at p. 5). None of the creditors objected to the procedure for voting contained in the Second Amended Disclosure Statement.[2] Objections voiced at the confirmation hearing and thereafter to the disallowance of ballots for claims to which objections had been filed, and for which no temporary allowance for voting purposes was sought, were thus waived.

2. B.R. 3018 provides in part: A plan may be accepted or rejected by the following entities within the time fixed by the court pursuant to Rule 3017: (1) Any creditor whose claim is deemed allowed pursuant to § 502 of the Code or has been allowed by the court; ... Notwithstanding objection to a claim or interest, the court after notice and hearing *may* temporarily allow the claim or interest in an amount which the court deems proper for the purpose of accepting or rejecting a plan. (emphasis added)

## X. Compliance with Applicable Code Provisions

52. Section 1129(a)(1) requires that the Plan comply with all the applicable provisions of the Bankruptcy Code to be confirmable.

### a. Release of Non–Debtor Parties

53. With a narrow exception for community property claims, the Code provides that the discharge to be granted a debtor does not affect the liability of a third party for such debt. 11 U.S.C. § 524(e).

■ 54. To the extent that the language contained in the plan purports to release any causes of action against the Bank Group which the Debtor could assert, such provision is authorized by § 1123(b)(3)(A), subject to compliance with provisions of the code requiring that the plan be fair and equitable as to creditors and that the plan be proposed in good faith. The court concludes that such a release is within the discretion of the Debtor.

■ 55. The Plan does not appear to release any claims arising by or against third parties; however, to the extent that the Plan purports to release any cause of action held by a third party against the Bank Group or any other third party, including any cause of action that could be asserted against insiders of the Debtor, the cause of action is not property of the estate, and thus the release is unenforceable. *See, e.g., Matter of Sandy Ridge Development Corp.*, 881 F.2d 1346, 1361 (5th Cir. 1989).

### b. Solicitation of Votes

■ 56. Section 1125(b) of the Code provides: "An acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement ..."

57. This provision has been interpreted to require that the plan and disclosure statement be the only documents soliciting votes. *In re Texaco, Inc.*, 84 B.R. 893,

906–07 (Bankr.S.D.N.Y.1988); *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141 (Bankr.S.D.N.Y.1984). The plain meaning of the section requires a different conclusion. The language reflects congressional intent to impose a timing requirement rather than a ban on outside solicitation. The section specifically contemplates that there will be solicitation other than the disclosure statement, and merely imposes a requirement that the disclosure statement and plan or summary be transmitted first. *Century Glove Inc. v. First American Bank of N.Y.*, 860 F.2d 94, 100 (3d Cir. 1988).

■ 58. In connection with the hearing on the Second Amended Disclosure Statement, the Unsecured Creditors' Committee requested leave of court to submit a letter urging rejection of the Plans. Leave was granted to do so. Mr. William LeSage, president of the Debtor, testified at the hearing on confirmation, that, without leave of court, he had sent a letter to certain unspecified creditors in response to the Committee's letter, urging acceptance of the Plans. The letter was admitted into evidence as Debtor's Exhibit 69.

59. The letter asked creditors to read the Disclosure Statement carefully, and pointed out apparent conflicts of interest on the part of the Creditors' Committee. While the letter was outside the specific items in the solicitation process described in Section 1125 of the Code, the letter did not misinform creditors. The failure of the Debtor to obtain leave to submit the letter to creditors was not conduct so egregious as to require denial of confirmation of the plan.

## XI. Good Faith

60. Several parties alleged that the Plan was not proposed in good faith, because of alleged misdeeds in connection with a failed attempt to restructure the Debtor outside of bankruptcy between 1984 and 1988. A 1989 exchange offer by the Debtor for repurchase of the two issues of subordinated notes failed to achieve the requisite 85% acceptance and lapsed according to its terms.

61. The evaluation of good faith is not based on the plan proponents' behavior prior to the filing of the bankruptcy petition. It is only based on the Plan and its acceptance. *In re Texas Extrusion Corp.,* 68 B.R. 712 (Bankr.N.D.Tex.1986) *aff'd* 844 F.2d 1142 (5th Cir.1988).

62. The requirement of good faith must be viewed in light of the totality of the circumstances surrounding establishment of a Chapter 11 Plan, keeping in mind the purpose of the Bankruptcy Code to give debtors a reasonable opportunity to make a fresh start. Where the plan is proposed with the legitimate and honest purpose to reorganize, and has a reasonable hope of success, the good faith requirement of section 1129(a)(3) is satisfied. *In re Sun Country Development,* 764 F.2d 406 (5th Cir.1985).

63. Objections to the relevance for purposes of confirmation, of the allegations related to these events were sustained on grounds of the remoteness of their connection to the present Plan.

64. Mr. LeSage testified that before the petition, the Debtor was building and selling homes in thirty-three to thirty-seven subdivisions. Mr. LeSage further testified that the reorganized Debtor planned to continue operations in the twelve subdivisions believed most likely to produce a profit (Tr. 8/9/91, at p. 3).

65. The court finds that the Plan was proposed with the hope of rehabilitation and reorganization, and continued operation at a smaller scale.

### XII. *Liquidation Test*

66. The Debtor showed assets on its balance sheet as of April 30, 1991, of $232,552,000.00 (Debtor's Exhibit 22). Mr. James C. Alexander, the Treasurer, Vice President, and Secretary of the Debtor, testified that while the particular assets shown were changing over time due to activities such as the sale of houses and purchase of new lots, the mix of assets and the estimated distribution to creditors were accurate as of the date of the beginning of the confirmation hearing (Tr. 7/29/91, at p. 5).

67. The Debtor estimated administrative and priority expenses of the Chapter 11 case to be approximately $4,975,000.00 (Debtor's Exhibit 30). The Debtor's estimated debt to the Bank Group on behalf of its secured and unsecured claims is approximately $234 million.

68. The value to be distributed to senior creditors on behalf of unsecured claims in a liquidation is estimated by the Debtor (without conflicting evidence proffered by any other party) to be under nine percent. The Subordinated Claims and Noteholders would receive nothing in a liquidation, because the Bank Group, even in its unsecured capacity, is senior to the Subordinated Claims and Noteholders.

69. The GHC plan calls for an estimated distribution to senior unsecured creditors of ten to twenty percent.

70. The testimony, both lay and expert, put on by Debtor, regarding the liquidation value of the assets of the Debtor was credible. No other party put on witnesses on this point. The liquidation value was estimated at approximately $106 million. The court concludes that the Plan provides a greater return to creditors than they would receive in a liquidation. Thus the plan satisfies the requirement of § 1129(a)(7)(A)(ii).

### XIII. *Feasibility*

71. The Debtor presented evidence of the investment value of the reorganized Debtor through the testimony of Mr. Mark Duffey, of Sovereign Capital Partners, who was properly qualified as an expert. Mr. Duffey testified to the values of the preferred and common stock to be distributed to the Bank Group on behalf of its secured and unsecured claims.

72. None of the parties to the confirmation hearing other than the Debtor presented testimony on the going concern value of the Debtor.

73. Mr. Duffey testified that he derived an investment value for the company based on comparable companies using the AL-CAR computerized service. He testified that he made assumptions based on the ability of comparable publicly traded com-

panies not in bankruptcy to obtain financing.

74. The Duffey (Sovereign Capital Partners) report lists an investment value for the reorganized Debtor under the Plan of $33.9 million (valuing the senior secured debt at $19.4 million, the preferred stock at $7.3 million, and the common stock at $7.2 million). The ALCAR service used by Duffey is a computer model which suggests a company's investment value when given input information from a public data base regarding comparable companies in a given industry, the weighted average cost of capital, and cash flow.

75. Duffey testified that in determining the investment value of the Debtor, he compared 10 companies, all of which were publicly traded, healthy homebuilders who had not filed bankruptcy petitions. Duffey then added a two-and-a-half percent premium to the cost of capital to represent the additional cost of a Chapter 11 debtor obtaining credit. The comparable companies are selected by use of an industry code.

76. The Duffey report was admitted over objection. Objections to the report go to the weight, rather than the admissibility of the report. The companies selected for comparison notably did not include several major homebuilders which are privately held or have experienced financial difficulty (Tr. 7/9/91, at p. 16). The court has considered the report in a narrow light as offering the only expert evidence presented as to the investment value of the reorganized company, for purposes of determining the value of what the Bank Group is receiving under the plan.

77. The Creditors' Committee sought leave to propose a reorganization plan (Court's Exhibit 1, "Joint Stipulations", at 22) which adopted essentially the same business plan as the Debtor's Plan (Tr. 8/5/91, at 46–53). The Committee stipulated that the Committee plan provides that reorganized GHC will operate in accordance with the GHC business plan, retain the same assets, and operate the same subdivisions as the GHC Plan. The Committee is estopped to deny the viability of the Debtor's business plan. Accordingly,

objections to the Committee's challenging the viability of the business plan of the Debtor were sustained.

## XIV. *Classification*

78. A debtor enjoys considerable flexibility in the manner in which it classifies claims. Section 1122 allows a claim or interest to be placed in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class. It does not require that similar classes be grouped together but merely that any group be homogeneous. *In re Greystone III Joint Venture*, 102 B.R. 560 (Bankr.W.D.Tex.1989); *In re Ag Consultants Grain Division, Inc.*, 77 B.R. 665 (Bankr.N.D.Ind.1987).

79. The power to separately classify creditors is subject to a limitation that some reasonable grounds must exist in order to authorize the proposed classification scheme, other than to create a single accepting impaired class, solely in order to satisfy Section 1129(a)(10). One such rationale is a demonstrated economic need to treat certain otherwise similar claims differently. The legal character of a claim may also itself justify both disparate classification and treatment. *In re LeBlanc*, 622 F.2d 872, 879 (5th Cir.1980); *In re U.S. Truck Co.*, 800 F.2d 581 (6th Cir.1986); *Greystone*, 102 B.R., at 569.

80. In *Greystone*, the separate classification of trade creditors and deficiency claims was permitted, where the dividend to both classes was identical.

81. The classes created by the GHC Plan have differing legal rights, the character of which justifies their separate classification.

82. A bankruptcy court can permit discrimination when the facts of the case justify it. *LeBlanc*, 622 F.2d, at 872.

83. The Noteholders, through the Creditors' Committee, have alleged that they are entitled to equal priority with the remainder of the unsecured creditors. The Debtor has argued that the language of the indentures validly subordinates the notes

to other creditors, and alternatively, that the notes should be equitably subordinated.

84. A subordination agreement is enforceable in bankruptcy to the same extent that such agreement is enforceable under applicable nonbankruptcy law. 11 U.S.C. § 510(a).

85. A subordination agreement is to be interpreted in accordance with ordinary contract principles. Valid contractual subordination agreements have been uniformly enforced according to their terms by bankruptcy courts without proof of reliance by senior claimants. *In re Leasing Consultants, Inc.*, 2 B.R. 165, 168 (Bankr. E.D.N.Y.1980); *In re Holiday Mart, Inc.*, 715 F.2d 430, 433 (9th Cir.1983).

86. When the contract is unambiguous, the parties rights are governed exclusively by the contract. *Leasing Consultants*, 2 B.R., at 169.

87. The language of the indentures unambiguously states that the Notes are subordinate to "Senior Debt". The remaining inquiry is whether the other debts which receive distributions while the noteholders receive nothing, are in fact debts which fall within the definition of "Senior Debt".

88. The term "indebtedness incurred by the Company in the acquisition (whether by way of purchase, merger, consolidation or otherwise and whether by the Company or another person) of any business, real property, or other assets, whether currently outstanding or hereafter created" present in the indentures encompasses virtually all money-making activities in the ordinary course of business. It is very broad, but this does not make it ambiguous. *See, Leasing Consultants*, 2 B.R., at 168–69.

89. The claims in Classes GHC–19, GHC–20 and GHC–21 are all "Senior Debt" within the unambiguous definition contained in the indentures.

## XV. *Absolute Priority*

90. The GHC Plan failed to achieve acceptance by all impaired classes, so it is not *prima facie* confirmable pursuant to the provisions of § 1129(a)(8). The Debtor has elected to utilize the "cramdown" provisions of § 1129(b).

91. The GHC Plan provides that holders of secured claims either retain the liens securing such claims to the extent of the allowed amount of such claims, and that each holder of such claim receives deferred cash payments totalling the allowed amounts of the claims, or provides that the holders realize the indubitable equivalent of such claims.

92. The Subordinated Claims and Noteholder Claims are junior to the other three unsecured classes, and thus are not entitled to any distribution under the plan. A plan which provided for a distribution to these two classes without paying the allowed amount of senior unsecured claims would violate the absolute priority rule *per se*.

93. The Debtor has a substantial amount of prosecutorial discretion in deciding whether to pursue causes of action it may possess. *In re Revco D.S., Inc.*, 118 B.R. 468, 476 (Bankr.N.D.Ohio 1990). The Debtor has determined in the exercise of its business judgment that any causes of action against the Bank Group should not be pursued (Tr. 7/27/91, at 42–46). It appears that the continued involvement of the Bank Group is necessary to the reorganization and the Bank Group will own the stock of the reorganized Debtor. The release given to the Bank Group of any causes of action the Debtor may have against the Bank Group is of *de minimis* value. Alternatively, to the extent the release has value and is given to the Bank Group on behalf of the unsecured deficiency portion of the Bank Group's claim, this is permissible. The plan in this event does not provide for a distribution to a class junior to the Bank Group's unsecured claim. Section 1129(b)(2)(B)(ii).

Based on the above Findings of Fact and Conclusions of Law, the court by separate Judgment confirms the plans of General Homes Corporation and FGMC, Inc.